**UNITED STATES of America**

v.

**Nunzio PROVENZANO, Appellant in 81–2411.**

**Appeal of Irving COTLER, in 81–2412.**

**Nos. 81–2411, 81–2412.**

United States Court of Appeals, Third Circuit.

Argued June 9, 1982.

Decided Sept. 1, 1982.

Rehearing and Rehearing In Banc Denied Sept. 27, 1982.

Certiorari Denied Dec. 6, 1982. See 103 S.Ct. 492.

Gerald L. Shargel (argued), Jay Goldberg, New York City, for appellant Nunzio Provenzano.

Irving Anolik, New York City (argued), Donald R. Conway, Hackensack, N. J., for appellant Irving Cotler.

W. Hunt Dumont, U. S. Atty. (argued), Thomas L. Weisenbeck, Maryanne Trump Desmond, Asst. U. S. Attys., Newark, N. J., for appellee United States of America.

Before ADAMS and WEIS, Circuit Judges and CONABOY,* District Judge.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal from their RICO convictions, defendants raise a number of issues, including denials of a severance, denial of psychiatric examinations of government witnesses, and defective affidavits supporting warrants for wiretaps. Another complaint is that not all of the twelve grand jurors who voted for indictment attended every session at which evidence was received. Although we do not find that circumstance sufficient to vitiate the indictment, we suggest that in the future, grand jury absentees be required to read transcripts of missed sessions. There being no reversible error in any of defendants' contentions, however, we permit the convictions to stand.

Appellants and two others were indicted for violations of 18 U.S.C. § 1962(c), as well as conspiracy. The charges arose out of defendants' activities in obtaining illegal payments from four trucking companies in order to secure labor peace. After a lengthy jury trial, two of the defendants were convicted. Two others were acquitted.

Appellant Nunzio Provenzano served in various capacities in Teamsters Union Local 560 in northern New Jersey, progressing from business agent to secretary-treasurer, and then to president in 1975. The other appellant, Irving Cotler, was the owner of several trucking companies which had no contracts with Local 560. During the period covered by the indictment, the labor contract between Local 560 and signatory companies contained a "city man rule." This provision required any trucking company hauling iron, steel, and special commodities within the jurisdiction of Local 560

* The Honorable Richard P. Conaboy, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

to secure express authorization for its operations from the union. Absent such permission, a company was required to utilize the services of a Local 560 "city man" during pickup and delivery.

Ray Dee acted as the North Jersey agent for All States Trucking Company. In 1972, after Provenzano became the union's business agent, the permanent "city man" assigned to All States was discharged. Sometime after this, Dee began making payments to defendant Cotler in exchange for All States' freedom to operate without the use of a city man. In 1975, All States expanded its operation, and began using an additional agent named Joe Mabus. He made payments to Provenzano through another intermediary until he was imprisoned in early 1975. After that occurred, Mabus made no further payments, and a few months later, Local 560 struck All States. The strike ended when All States' president discharged Mabus and agreed to use city men. The Ray Dee agency's transactions, however, were not affected by the strike.

About a year later, All States' vice-president met with Provenzano in a preliminary step to reopen an iron and steel agency in Local 560's area. The company's overtures were rejected until a few weeks later when Ray Dee, Jr. arranged a meeting between the vice-president and Cotler. For $100 per day, Cotler said All States would not need a city man for any of its shipments. He then took the vice-president to Local 560's office, where they conferred with Provenzano, who stated that Cotler was a "good friend" and advised the vice-president to "listen to what he is telling you." For the next three years, All States arranged to have Ray Dee, Jr. pay Cotler $100 per day in addition to Dee's own payments to protect his agency.

In 1975, another trucking company, T. I. M. E.–D. C., began special commodity operations in North Jersey and hired Joe Szapor as its agent. Through Teamster contacts, Szapor had a meeting with Provenzano and three other men. The agent was assured he would be contacted, and sometime later, Szapor was introduced to Cotler. Cotler said he would be collecting for Local 560,

and told Szapor not to travel to the union. During the next year, Cotler was given $500 per month and T. I. M. E. was able to avoid using city men.

When T. I. M. E.'s business began to prosper, Cotler said the monthly payment should be increased. T. I. M. E. acquiesced and continued to make pay offs until April 1979. During this same period, T. I. M. E. had a number of grievances with Local 560. Szapor protested to Provenzano about these problems since T. I. M. E. was making its regular payments. Provenzano told Szapor to resolve the grievances at the terminal level. When Szapor then spoke to a Local 560 business agent, the grievances were settled.

Between 1977 and 1979, similar arrangements were made with two other trucking companies, Helms Express and Mason and Dixon, which paid Cotler through the Szapor and Ray Dee agencies, respectively. Mason and Dixon paid a fixed weekly fee, but Helms was required to remit a percentage of its revenues.

The jury convicted Cotler and Provenzano on both counts of the indictment. On appeal, the defendants allege numerous trial errors. Cotler contends he was prejudiced by denial of his motions for severance made both before and during the trial. He also asserts that the warrants used to secure court-authorized wiretaps were not supported by adequate grounds. He further argues that the district court erred in refusing to order psychiatric examinations of Ralph Picardo and Joseph Szapor, two witnesses who testified for the government. Finally, he contends his privacy rights were violated by Szapor's use of recording devices during their conversations.

Provenzano also argues that there should have been a severance. In addition, he contends that there was insufficient evidence to show that the "enterprise" was conducted "through a pattern of racketeering activity" as required by RICO. As his last point, he asserts that the trial judge erred in declining to disclose grand jury minutes and transcripts. The defense contends that there were two justifications for

disclosure. First, some of the witnesses who testified before the first grand jury were not called before the succeeding indicting grand jury; and second, not all of the twelve jurors who voted for indictment were present at every session of the indicting grand jury.

## I. THE SEVERANCE ISSUE

### A.

■ Cotler argues that he was the victim of a concerted attack at trial by the other three defendants, which, when combined with the government's effort, meant that he was being prosecuted by four parties instead of one. He points to the other co-defendants' derogatory remarks about him and their efforts to disassociate themselves from him at the trial. In particular, Cotler says that the co-defendants' tactics in taking the witness stand, and their pointed comments about being unable to cross-examine him, emphasized his decision not to testify.

We are not persuaded, however, that there was a real antagonism in the defense strategies of this case. Rather, they were complementary, for if the jury had been persuaded that Cotler alone received the payoffs and was unconnected with any of the other defendants, there would have been a failure of proof on the conspiracy and RICO counts. Not only his co-defendants, but Cotler as well, would have walked away from the indictment had sole culpability been fastened on him.

In short, the "ganging up" theory is unconvincing when it is realized that Cotler stood to benefit if the jury accepted the co-defendants' theory that he was off on a frolic of his own. Indeed, in his summation, Cotler's counsel argued that none of the money went to any of the co-defendants. In light of the overwhelming evidence against Cotler, putting as much distance between him and the defendant union officials was probably the best strategy to avoid conviction.

Cotler relies on *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir. 1978), to support his contention that antagonistic defenses can prejudice co-defendants to such a degree that they are denied a fair trial. But, as the court in *Crawford* noted, such defenses must conflict "to the point of being irreconcilable and mutually exclusive." *Id.* (citations omitted). That is just not the situation here. In *United States v. Barber*, 442 F.2d 517, 530 (3d Cir.), *cert. denied*, 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (1971), we rejected a similar argument saying, "the mere presence of hostility among defendants" is insufficient to require separate trials. That is especially true in this case, where the hostility exhibited at the trial, if accepted by the jury, would be advantageous to the co-defendants.

### B.

■ Provenzano takes a different tack on the severance issue. He contends that if there had been separate proceedings, Cotler would have testified. The fact that the trials were joined, and that Cotler exercised his right not to testify, Provenzano argues, amounted to an infringement on his rights of confrontation and compulsory process. At an earlier stage in the joint trial, Cotler's attorney did represent to the court that if there were separate trials, Cotler would take the stand at the request of any defendant. Counsel apparently later had second thoughts on this matter and declined to proceed nonjury as to Cotler's own case. Provenzano reasons that if Cotler had been tried first, there would have been no fifth amendment problem thereafter. But a defendant cannot compel a co-defendant to testify even if their trials are severed, *United States v. Barber*, 442 F.2d at 529, so more than a possibility that a co-defendant will testify is required. *See United States v. Rosa*, 560 F.2d 149, 156 (3d Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977).

■ We are not persuaded by Provenzano's contention that he was substantially harmed by inability to use cross-examination to blunt or weaken the force of statements made by Cotler and admitted into evidence as those of a co-conspirator. We

note that as a result of the chambers' conference between counsel and the trial judge, it was agreed that co-defendants' counsel could comment in final arguments on their inability to call Cotler as a witness. However, counsel was not to argue that there could be any inference of guilt against Cotler because of his failure to testify. *See United States v. Addonizio*, 451 F.2d 49, 62–63 (3d Cir. 1971), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). We are not convinced that cross-examination of Cotler would have aided the co-defendants more than counsels' comments about their inability to cross-examine him.

 In *United States v. Boscia*, 573 F.2d 827, 832 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978), we outlined four factors that a district court should consider in deciding whether a severance should be granted:

1. The likelihood of co-defendant testifying;
2. The degree to which such testimony would be exculpatory;
3. The degree to which the testifying co-defendant could be impeached;
4. Judicial economy.

It is apparent that on the record of this case items one and four have not been satisfied.

At one point, it appeared that Cotler would testify if the trials were severed. However, his attorney's later rejection of a suggestion that Cotler proceed non-jury indicates uncertainty that he actually would take the witness stand if a severance had been granted. Although Cotler's counsel did indicate that his client's testimony would be exculpatory in nature for Provenzano, Cotler would also be subject to impeachment, particularly if he had been tried first and convicted. Finally, judicial economy concerns were present, and in a case of this nature, it is preferable to have all of the parties tried together so that the full extent of the conspiracy may be developed. *See United States v. Rosa*, 560 F.2d at 156; *United States v. Reicherter*, 647 F.2d 397, 399 (3d Cir. 1981); *United States*

*v. Armocida*, 515 F.2d 29 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Somers*, 496 F.2d 723, 731 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).

 We similarly find no merit to Cotler's contention that there was a misjoinder under Fed.R.Crim.P. 8. His argument is that a misjoinder was shown because there was a variance between the conspiracy charged in the indictment and the proof adduced at the trial. The record does not support this assertion and, in any event, it is foreclosed by *United States v. Somers*, 496 F.2d at 729, where we rejected the position that is asserted here. Thus, neither defendant has demonstrated any abuse of discretion by the trial court. We therefore find no error in the district court's refusal to sever the cases.

## II. THE RICO COUNT

Provenzano argues that the government failed to prove that a nexus existed between the enterprise—Local 560—and the pattern of racketeering activity. According to his theory, the statute is not satisfied unless it is shown that the enterprise was advanced or benefitted by the pattern of racketeering activity. He contends that even though the record would establish that he personally profited from payoffs, the interests of the union were not advanced. Thus, his actions in fact worked to the detriment of the union and were contrary to the obligations of his office.

The statute, 18 U.S.C. § 1962(c) provides in pertinent part:

"It shall be unlawful for any person employed by ... any enterprise ... the activities of which affect interstate ... commerce, to conduct or participate, ... in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

 Defendant relies upon *United States v. Webster*, 639 F.2d 174, *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981). There, a panel of the Court of Appeals for the Fourth Circuit at first held

that the statute does not extend to a "situation where the racketeering activities are advanced through the assistance of the enterprise." *Id.* at 184. The court focused on the word "through" in the statutory language, and reasoned that in order to conduct an enterprise's affairs "through" a pattern of racketeering activity, the enterprise's affairs must necessarily be advanced by the racketeering. *Id. See also* Note, 12 Seton Hall L.Rev. 116 (1981). Nor did the court find any evidence of congressional intent to reach cases where "the racketeering activity made use of the resources of the enterprise but did not provide the enterprise with any benefit. . . ." *Id.* at 184.

The panel later modified its original opinion, however, finding instead that the proper question should have been whether the affairs of the enterprise "were *conducted* through the pattern of racketeering activity, not whether they were benefitted or advanced or whether profit to the [enterprise] resulted." 669 F.2d 185, 186–87 (4th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982).

We agree with the Fourth Circuit's latter interpretation of the relevant statutory language. The record here demonstrates that, by accepting bribes in exchange for allowing violations of the collective bargaining agreements to be overlooked, Provenzano was conducting his union office through racketeering activity. The fact that the union was harmed rather than benefitted does not remove the conduct from RICO's ambit.

A similar situation is presented when public officials accept bribes in the course of their duties. Thus, in *United States v. Frumento*, 563 F.2d 1083 (3d Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), the convictions of state officials who participated in a cigarette smuggling conspiracy to the detriment of the "enterprise," the state itself, were affirmed. Similarly, convictions were upheld in *United States v. Salvitti*, 451 F.Supp. 195 (E.D.Pa.), *aff'd mem.*, 588 F.2d 822 (3d Cir. 1978) (Executive Director of Redevelopment Authority of Philadelphia—accept-

ance of bribes); *United States v. Vignola*, 464 F.Supp. 1091 (E.D.Pa.), *aff'd mem.*, 605 F.2d 1199 (3d Cir. 1979) (Traffic Court judge—acceptance of bribes). Although these cases did not state that there can be culpability without benefit to the enterprise, that premise is implicit in the convictions which were affirmed.

In *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), the defendant, a union officer, received illegal labor payoffs. The Court of Appeals for the Second Circuit held that one conducts the activities of an enterprise through a pattern of racketeering when:

"(1) One is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or

(2) the predicate offenses are related to the activities of that enterprise."

*Id.* at 54. It is only when the predicate acts are unrelated to the enterprise or the actor's association with it that the nexus element is missing, and consequently there is no RICO violation. That is clearly not the situation presented here. Provenzano was able to circumvent the bargaining agreement because of his position in the union, and the payoff scheme was related to the union's activities, albeit in a detrimental manner.

That rationale is consistent with our approach in *Frumento* and the district court cases of *Salvitti* and *Vignoli*. *See also* B. Tarlow, *Rico: The New Darling of the Prosecutor's Nursery*, 49 Ford.L.Rev. 165, 228–34 (1980). Accordingly, the trial judge did not err in submitting the RICO counts to the jury.

## III. GRAND JURY ISSUES

Before trial, all of the defendants moved for disclosure of the transcripts of grand jury attendance records and voting tallies. The defendants urged two grounds as justification. First, they believed the indicting grand jury may have relied on summaries

of testimony before the original grand jury, which had heard evidence in the case, but whose term expired before the indictments were returned. The second ground was that not all of the twelve jurors who voted for indictment had attended every session of the grand jury.

## A.

The district court accepted the response of the government that the first grand jury heard testimony from 19 individuals. The second grand jury heard testimony from 51 people, two of whom had also appeared before the first grand jury. The testimony of a third prior witness was read in full to the indicting jury. No summaries were used before the second grand jury, but it had the opportunity to review all of the testimony received by the first. Because not all of the witnesses who appeared before the first grand jury testified before the indicting jury, Provenzano analogizes the procedure to the use of summaries. The district court recognized that abuse could occur through the use of successive grand juries, but did not find any to exist in this case.

We have indicated our concern with the practice of having a number of grand juries hear testimony which the indicting grand jury ultimately uses as a basis for indictment. *See United States v. Helstoski*, 635 F.2d 200, 202 & n.2 (3d Cir. 1980). We do not think that in this case, however, the district judge erred in refusing the defendant's request for disclosure of the grand jury transcripts.

The government justified its conduct by claiming that the investigation had taken a new turn after the second jury was impanelled. The large number of witnesses called by the indicting grand jury and the few recalled from the first group support that contention. In addition, extensive proceedings before the indicting grand jury are consistent with a complete and legitimate inquiry into the charges. Because of the number of persons called before the indicting jury, it does not appear that the government was being "selective" when it chose to limit the number of witnesses from the first to appear before the second. We conclude, therefore, that the trial judge properly determined that defendants had not demonstrated particularized need for breaching grand jury secrecy.

## B.

A more difficult question is presented by the other complaint against the grand jury—that not all who voted for the indictment had attended all of the 23 sessions. The district judge examined the voting tallies and attendance records *in camera*, and found that out of the twelve votes necessary under Fed.R.Crim.P. 6(f), three of the voting jurors attended every session, four missed one session each, three were absent from two sessions each, and two jurors were not present three sessions each.

Although there was not a perfect attendance record for the twelve voting jurors, the district judge, relying on *United States v. Leverage Funding Systems, Inc.*, 637 F.2d 645 (9th Cir. 1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981), held that neither the Fifth Amendment nor the Federal Rules of Criminal Procedure imposed such a requirement. As long as a quorum was present at every session and at least twelve jurors voted to indict, both the Constitution and the rules were satisfied. The court did concede that there may be a situation where a grand juror missed so much of the evidence that the Fifth Amendment would not permit his vote to be counted, but found no such demonstration had been made here. As an additional reason for denying the defendant's motion, the court pointed out the undesirability of holding "preliminary" trials to determine the competency and adequacy of the evidence before the grand jury.

The necessity for insuring that the grand jury be informed of all the evidence cannot be ignored. As the Supreme Court said in *Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962), "[the grand jury] has been regarded as a primary security to the innocent against

hasty, malicious and oppressive persecution." It is that body which determines whether "a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." We have rejected the proposition that the grand jury is simply a prosecutor's tool and have noted its constitutional role as a shield against unjustified charges. *See United States v. Goldstein*, 502 F.2d 526 (3d Cir. 1974) (in banc); *United States v. Serubo*, 604 F.2d 807 (3d Cir. 1979); *In re: Grand Jury Proceedings (Schofield)*, 486 F.2d 85 (3d Cir. 1973). Yet it is clear that the criminal process must not be bogged down by extensive pretrial review of grand jury activity. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

The district court's opinion in *United States v. Leverage Funding Systems, Inc.*, 478 F.Supp. 799, 801 (C.D.Cal.1979), stated that if the grand jury was to fulfill its role as an independent body, at least twelve grand jurors who voted to indict should have been informed of all the evidence submitted. In that case, nine jurors were present at all 13 sessions, five were present at 12, two for 11, and two were present at nine sessions, while one was present for only six. The district judge discounted the votes of the absentee jurors, finding that a grand juror cannot be considered informed unless he attends all sessions at which evidence is presented on the proposed indictment. *Id.* at 803. A divided panel of the Court of Appeals for the Ninth circuit reversed, observing that a grand juror's function is to decide whether probable cause to believe that a crime has been committed exists. 637 F.2d at 648. The appellate court believed that this duty could be performed even if a grand juror was absent during the presentation of some exculpatory evidence.

The Second Circuit in *United States ex rel. McCann v. Thompson*, 144 F.2d 604 (2d Cir.) *cert. denied*, 323 U.S. 790, 65 S.Ct. 313, 89 L.Ed. 630 (1944), expounded the approach later adopted by the Ninth Circuit, observing that since it is quite remote that exculpatory evidence would be presented to a grand jury, it is unlikely that a defendant would be harmed by the absence of a grand juror. The absentee would merely not have heard all of the inculpatory evidence. The court in *United States v. Colasurdo*, 453 F.2d 585, 596 (2d Cir. 1971), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972), reaffirmed this position, adding that to permit a review of attendance from voting records "would bog down the courts in a morass, a veritable jungle of speculation and conjecture."

*United States v. Lang*, 644 F.2d 1232, 1235 (7th Cir.), *cert. denied*, 454 U.S. 870, 102 S.Ct. 338, 70 L.Ed.2d 174 (1981), said that the requirements of Rule 6 belied any intention of imposing a perfect attendance requirement, for the rule only mandates that a quorum be present at every session. The court also noted that Congress had acted to extend grand jury terms to allow adequate investigations of complex criminal activity. To invalidate indictments because of jury attendance would frustrate that congressional intent. *Id.* at 1238.

The reasons advanced by the appellate courts which have considered the problem are weighty ones but, nevertheless, leave us somewhat uneasy. It is indeed speculative to consider what bit of evidence might have persuaded a grand juror to vote for or against an indictment. But the grand juror's judgment is what the Constitution requires, and the defendant is entitled to an informed determination of probable cause.

We recognize the practical problems created by the very nature of the grand jury's investigative role. Not all the evidence can be presented at one time—one witness' testimony may lead in turn to an investigation that extends over a period of time. Some witnesses may be unavailable at a given point and other circumstances may hinder prompt expedition. The longer the period of service, the more absences may be expected.

The provisions of Rule 6(e)(1), which require the recordation of grand jury proceedings, aid us in reaching agreement

with the solution proposed by the *Lang* court. As its opinion observed, "[p]rosecutors can insure that the perception of fairness, as well as its substance, are maintained by giving replacement and absent grand jurors the opportunity to review transcripts . . . of missed sessions. That should go a long way to ameliorate the concerns raised here." 644 F.2d at 1239.[1] If a review of the transcripts should raise questions in a juror's mind which could be resolved by recalling a witness, that alternative would be available. Following this procedure would insure that each grand juror is fully informed of the evidence which has been presented.

■ It would have been better to utilize such a practice in this case, but we cannot say that failure to do so vitiates the indictments. We rely on the judgment of the district judge who had the opportunity to review the grand jury records *in camera*. The grand jury here had 23 separate sessions, and although the number of absences may border the limits of acceptability, it does not reach the point where we must say that the defendant's rights have been violated. As we note above, furnishing transcripts to absent jurors is a practical way to avoid attacks on grand jury voting in the future.

In view of all the circumstances here, we conclude that the district court did not err in its refusal to unseal the grand jury records.

## IV. PSYCHIATRIC EXAMINATION OF WITNESSES

■ Before trial, Provenzano's attorney submitted a motion requesting psychiatric examinations of government witnesses Ralph Picardo and Joseph Szapor. Supporting the motion was an affidavit which stated that Picardo had been branded a "liar," a "little crazy", "off-the-wall", and "a pathological liar," by a number of government witnesses in an earlier unrelated trial. In addition, after his conviction in February of 1975 for murder, Picardo was confined for

psychiatric examination at the New Jersey State Prison at Trenton. As to Szapor, the defense recited a number of bizarre actions and an allegation that drugs prescribed for treatment and pain may have affected his competency and credibility.

The trial judge refused to order the examinations, finding that the attacks posed a credibility issue for jury resolution. Cotler now asserts that the denial of his motion was an abuse of discretion. The defendant concedes that the question of credibility is ultimately one for the jury, but argues that the opinion of a psychiatrist would be helpful in the deliberations.

We note that both witnesses were extensively cross-examined. As a result, the jury heard about Picardo's murder conviction and his cocaine and marijuana use, that he used relatives without their knowledge to further his criminal schemes, and that he believed self-preservation was "the name of the game." The record also demonstrates his incentive to furnish information to the federal authorities in order to avoid state prosecution.

The cross-examination of Szapor was so effective that the trial judge commented that the witness's credibility was "certainly placed in doubt not only by the evidence offered by the defendants, but certainly as a result of his cross-examination. . . ." Thus, the evidence before the jury provided ample information for its task of evaluating the truthfulness of the two witnesses.

We find no abuse of discretion in the judge's refusal to order the psychiatric examinations. In *United States v. Pacelli*, 521 F.2d 135, 140 (2d Cir. 1975), *cert. denied*, 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976), the court said that the question is within the discretion of the trial judge and will not be disturbed unless it is plainly in error. We adopt that standard also.

■ Even if the examination had been ordered, it is doubtful at best that psychiatric testimony would have been appropriate

1. Although the court approved the summaries as an alternative, we do not recommend their use unless for some valid reason transcripts are not available.

here. The use of such evidence at trial to attack or support a witness's credibility has not been generally favored. In *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973), *cert. denied*, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974), the court emphasized the jury's responsibility to assess credibility. Doubting that psychiatrists have more expertise in this field than juries, the court pointed out that such expert testimony might cause jurors to surrender their common sense in weighing the evidence and could produce a trial within a trial. The court concluded that this type of testimony should only be received in unusual cases. *Id.* at 913. The record in this case did not establish anything so out of the ordinary as to require—or indeed justify—the use of psychiatric testimony. The eccentric behavior that might have been deemed significant by a psychiatrist was fully explored before the jury. *See also, United States v. Jackson*, 576 F.2d 46, 48–49 (5th Cir. 1978); *United States v. Russo*, 442 F.2d 498 (2d Cir. 1971), *cert. denied*, 404 U.S. 1023, 92 S.Ct. 669, 30 L.Ed.2d 673 (1972).

### V. OTHER MATTERS

Cotler also contends that the affidavits supporting the issuance of warrants for wiretapping and searches were inadequate. In particular, one affidavit is alleged to contain 26 pages of irrelevant and prejudicial material. When that material is deleted, however, adequate probable cause is demonstrated. *See United States v. Sterling*, 369 F.2d 799 (3d Cir. 1966). We are not persuaded that the alleged prejudicial aspects unduly influenced the judge who issued the warrants. The defendant's contention that the evidence should have been suppressed was properly rejected by the trial court.

Finally, defendant Cotler asserts that his right to privacy was violated by the consensual recordings made by witness Szapor. We find no merit to this contention. *See, e.g., United States v. Armocida*, 515 F.2d 29, 51–52 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975).

Accordingly, the judgment of the district court will be affirmed.