**MOFFATT ENTERPRISES, INC., Eugene Moffatt, Raymond Moffatt, Robert Moffatt and Sidney Moffatt, Plaintiffs,**

v.

**BORDEN, INC., Defendant.**

**Civ. A. No. 82–2536.**

United States District Court, W.D. Pennsylvania.

Feb. 7, 1990.

Daniel M. Berger, Berger Kapetan Malakoff & Meyers, P.C., Pittsburgh, Pa., and Prentice H. Marshall, Jr., Sidley & Austin, Chicago, Ill., for plaintiffs.

Frederick N. Egler, Egler, Anstandig & Garrett, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, Chief Judge.

The Moffatt brothers—Eugene, Raymond, Robert and Sidney—and their corporation, Moffatt Enterprises, Inc., bring this action alleging, inter alia, that Defendant Borden, Inc. fraudulently induced them to enter into a distributorship agreement whereby they would distribute "Insulspray," a foam insulation manufactured by Borden. In addition to six counts asserting state common law claims, plaintiffs have asserted claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. Borden has moved to dismiss the RICO claims. For the reasons that follow, we conclude that plaintiffs have failed to assert any colorable claim under RICO and that Counts Seven, Eight and Nine of Plaintiffs' amended complaint should be dismissed.

## I. *Facts* [1]

Borden began manufacturing and selling Insulspray in 1975. Insulspray is a foam insulation which is propelled by a gun into wall cavaties where it hardens. In March of 1975, Eugene Moffatt contacted Borden in an effort to obtain Insulspray for use in his home. After learning that Borden did not have a distributor for Insulspray in his area, Eugene began negotiations with Borden to become an Insulspray dealer. In the fall of 1975, Eugene, Raymond and Robert Moffatt formed the partnership, Moffatt Enterprises, to distribute Insulspray to authorized dealers in the New Castle, Pennsylvania area. The partnership also established Thermal Acoustics, a business which installed Insulspray. On October 31, 1975, the Moffatts entered into the first in a series of distributor contracts with Borden.

In 1976, as the Moffatts' business began to grow, Sidney Moffatt quit another job so he could work full time for Moffatt Enterprises. In 1977, Eugene and Raymond also resigned from other employment, in order to form Moffatt Enterprises, Inc. They also later established Insulattic, Inc. to fabricate cellulosic insulation for attics. In October, 1978, plaintiffs bought bulk equipment to enable them to expand their distribution area into North Carolina. On December 4, 1978, Borden notified plaintiffs that it would cease producing Insulspray on December 31, 1978. Despite attempts

1. For a more complete history of this case, see *Moffatt Enterprises, Inc. v. Borden,* 807 F.2d 1169 (3rd Cir.1987).

by the Moffatt brothers to sustain Moffatt Enterprises, Inc., it fell apart in 1980.

Plaintiffs herein allege that Borden induced them through fraud and misrepresentation, to enter into the distributorship, to continue to renew it, to make capital outlays, and to quit their other jobs. Specifically, plaintiffs allege that Borden 1) knew of and concealed from them health and safety concerns regarding Insulspray; 2) misrepresented the insulating efficiency of Insulspray; 3) misrepresented the extent of testing that had been done on Insulspray; and 4) misrepresented the profitability of Insulspray, and its own commitment to producing it. In addition, plaintiffs allege that Borden urged them to purchase capital equipment in October, 1978, even though Borden had already decided to cease producing Insulspray.

## II. *Count Seven—Section 1962(a) Claim*

Count Seven of plaintiffs' amended complaint asserts a RICO claim under 18 U.S.C. § 1964(c) based on an alleged violation of § 1962(a). Section 1964(c) of RICO provides a damage remedy for:

> Any person injured in his business or property by reason of a violation of section 1962 ...

Section 1962(a) declares it unlawful for:

> any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Plaintiffs assert that the only injury they need to show to recover for a violation of § 1962(a) is that injury which stems from the predicate racketeering activities themselves. Borden on the other hand, argues that in order to have standing to assert a claim for a § 1962(a) violation, plaintiffs must allege some injury occurring as a result of the use or investment of the proceeds of the racketeering activity. In their briefs, both parties cite a number of cases from other districts which reflect a lack of consensus as to what type of injury is necessary to have standing to maintain an action for a § 1962(a) violation.

Since the time when the briefs of the parties were submitted, we have been graced with the guidance of the Third Circuit's decision in *Rose v. Bartle*, 871 F.2d 331 (3rd Cir.1989). In *Rose*, the Court clearly concluded that in order to plead a cause of action pursuant to § 1962(a), a plaintiff must allege an injury resulting from the use or investment of the racketeering proceeds, and not merely an injury resulting from the predicate racketeering acts. *See also, Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989).

■ Plaintiffs' amended complaint herein, refers only to those injuries suffered as a result of the underlying alleged racketeering activity. Since their amended complaint does not contain any allegation of injury suffered by reason of the use or investment of the racketeering proceeds which is prohibited by § 1962(a), we conclude that Count Seven should be dismissed.

## III. *Count Eight*

### A. Section 1962(b) Claim

In Count Eight of their complaint, plaintiffs assert a RICO claim under § 1964(c), based upon an alleged violation of § 1962(b). That section declares it unlawful for:

> Any person through a pattern of racketeering activity or through collection of unlawful debt to acquire or maintain, directly or indirectly, *any interest in or control of* any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. (emphasis added).

In paragraph 80 of their amended complaint, plaintiffs allege that Borden "controlled" the Moffatts and their corporation in the following manner:

> (a) Defendant induced Plaintiffs to enter into the enterprise as set out in paragraph 8;

(b) Defendant required Plaintiffs to obtain approval of their system for installing the Insulspray foram [sic] insulation, before allowing them to purchase or install Insulspray, the demonstration of the Plaintiff's system being one of the purposes of the meeting between Plaintiffs and Defendant's employees, Roy Wendt and Carleton Wood in Warren, Ohio in June, 1975;

(c) Defendant specified the geographical area in which the Moffatt enterprise was to operate, by the distributorship contracts and the addenda thereto;

(d) Defendant enforced the geographical limitations of the Moffatt enterprise distributorship, said enforcement being the purpose of a meeting in Pittsburgh, Pennsylvania, in fall, 1977 between Leonard Loftus, Defendant's National Sales Manager for Insulspray and Roy Wendt, and Plaintiffs Eugene and Robert Moffatt;

(e) Defendant required the Moffatt enterprise to establish a network of contractors satisfactory to Defendant. Defendant retained the right to disapprove Moffatt enterprise contractors and to appoint another distributor in the Moffatt enterprise territory at its discretion, if dissatisfied with the contractor organization established;

(f) Defendant specified sales quotas that the Moffatt enterprise was required to meet, on pain of termination of the distributorship agreements;

(g) Defendant, at various time, either trained the Moffatt enterprise installers or required the Moffatt enterprise to provide Borden's training to its installers. Defendant required that all Moffatt enterprise installers or dealers be certified according to Borden's standards and to periodically be recertified. Defendant permitted the Moffatt enterprise to sell Insulspray only to certified dealers;

(h) Defendant required the Moffatt enterprise to assume responsibility for resolving consumer complaints within its geographical territory, pursuant to procedures dictated by Defendant;

(i) Defendant required full time effort of the individual Plaintiffs to be devoted to the enterprise, so that individual Plaintiffs were required to resign their full time employment, and in July, 1977, incorporated corporate Plaintiff, as set out in the foregoing paragraphs 15 through 19;

(j) Defendant required the Moffatt enterprise to obtain an assured source of cellulose and to sell and install cellulose fiber insulation along with Insulspray, as set out aforesaid in paragraph 21;

(k) Defendant provided Insulspray advertising copy for the Moffatt enterprise and specified, restricted and limited the extent and content of advertising by the enterprise and its dealers. Defendant prohibited all other advertising without prior written approval by Defendant;

(l) Defendant specified the insurance to be carried by the Moffatt enterprise in the distributorship agreements and enforced the insurance provisions; and

(m) Defendant directed the Moffatt enterprise expansion into North Carolina in the fall of 1978, with the corresponding purchase of bulk equipment. Defendant arranged for and directed the Moffatt enterprise's participation in a North Carolina trade show in November, 1978, and Borden employee, Roy Wendt, participated along with the Moffatt enterprise at the trade show.

Plaintiffs then go on to allege that:

Defendant's fraudulent scheme to promote the sale and distribution of Insulspray, as set out hereinbefore, induced the formation of the Moffatt enterprise and enabled Defendant to exert control of or influence over the enterprise's operations, because of Plaintiffs' reliance on Defendant's representations and Plaintiffs' dependency on Defendant for the continued operation of the Moffatt enterprise.

Borden has moved to dismiss plaintiffs' § 1962(b) claim, arguing that the "controls" asserted are not in the nature of the "control" necessary to plead a sufficient cause of action under § 1962(b).

Unfortunately, while 18 U.S.C. § 1961 defines a number of RICO terms, "control" is not defined. In addition, there are very few reported cases which have attempted to resolve the question of what constitutes "control" under § 1962(b), and we glean little guidance from those that do. *See, e.g., NCNB Nat. Bank of North Carolina v. Tiller,* 814 F.2d 931 (4th Cir.1987); *Sutliff Inc. v. Donovan Companies, Inc.,* 727 F.2d 648 (7th Cir.1984); *Cincinnati Gas & Elec. Co. v. General Elec. Co.,* 656 F.Supp. 49 (S.D.Ohio 1986); and *Conan Properties, Inc. v. Mattel Inc.,* 619 F.Supp. 1167 (D.C. N.Y.1985). Nevertheless, we do find some guidance by examining the use of the term "control" in § 1962(a), and in the legislative history of RICO.

Section 1962(a), which prohibits the use or investment of the proceeds of racketeering activity in an enterprise engaged in or affecting interstate commerce, also provides for the following exception:

A purchase of securities on the open market for purposes of investment, and without the intention of *controlling* or participating in the *control* of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer. (emphasis added).

An examination of this exception to § 1962(a) reveals that the use of the term "control" in subsection (a) is in the context of the "control" one gains in a corporation by acquiring sufficient stock to elect one or more of its directors. Absent any indications to the contrary, we can only presume that Congress intended the scope of the term "control" to remain consistent throughout the complimentary subsections of § 1962.

■ Our interpretation of the term "control" is confirmed in the House Report to the Organized Crime Control Act of 1970 (P.L. 91–452). In that report, subsections (a) and (b) are explained and compared in the following manner:

Subsection (a) makes it unlawful to invest funds derived from a pattern of racketeering activity, as defined in section 1961(1) and (5), or collection of unlawful debt as defined in section 1961(6), in any enterprise engaged in interstate or foreign commerce. The funds must have been derived by the investing party from activity in which he participated as a principal. An exception has been provided for the purchase on the open market of less than 1 percent of acompany's securities where there is no degree of control in law or in fact to the investor.

Subsection (b) prohibits acquisition or maintenance of an enterprise through the proscribed pattern of racketeering activity or collection of unlawful debt. There is no 1 percent limitation here as in subsection (a) because (a) focuses on legitimate acquisition with illegitimate funds. Subsection (b) focuses on illegitimate acquisition with illegitimate funds. Subsection (b) focuses on illegitimate acquisition through the proscribed pattern of activity or collection of debt. Consequently, any acquisition meeting the test of subsection (b) is prohibited without exception.

H.R.Rep. No. 1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4033. From this comparison, it is clear that the "interest" contemplated in both § 1962(a) and § 1962(b) is in the nature of a proprietary one, such as the acquisition of stock, and that the "control" contemplated is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors.

We find it important to note herein, that we purport only to define the *"nature"* of

the interest and control contemplated and intended by Congress in enacting § 1962. We do not attempt to define their parameters, nor do we intimate that the only "interest" contemplated is the acquisition of stock, or the only "control" contemplated the ability to elect one or more directors. What we do conclude herein, however, is that the "interest" or "control" intended by Congress are *of that nature.*

■ Examining the nature of the "controls" plaintiffs assert Borden to have acquired, we conclude that they clearly are not of the nature Congress intended to be sufficient to state a cause of action for a violation of § 1962(b). The controls asserted are primarily those that are the normal contractual incidents of a typical distributorship agreement. None of them come even close to the nature of "control" intended and contemplated in § 1962(b). That portion of Count Eight which asserts a § 1962(b) cause of action, must therefore be dismissed.

### B. Section 1962(c) Claim

As an alternative to their § 1962(b) claim in Count Eight, plaintiffs also assert in Count Eight a claim based upon § 1962(c). Section 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

■ Similar to their § 1962(b) claim, plaintiffs allege Borden to be the "person" who *"conducted"* the affairs of the "enterprise"—the Moffatt brothers and their corporation. In seeking to have this alternative cause of action dismissed, Borden maintains that plaintiffs' allegations, if taken as true, merely establish that Borden's *dealings with* plaintiffs were fraudulent. This it is argued does not equate with *conduct of* plaintiffs' affairs. We agree. There are no allegations in plaintiffs' amended complaint, that plaintiffs' *own* af-

fairs were conducted through a pattern of racketeering activity. We therefore conclude that this case is very similar to and controlled by *Averbach v. Rival Mfg. Co.,* 809 F.2d 1016 (3rd Cir.1987), *cert. denied* 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987).

In *Averbach,* the Third Circuit upheld the dismissal of a § 1962(c) claim in which the plaintiffs alleged that defendants conducted the affairs of the district court (defined as the "enterprise") before which the action was pending, by filing fraudulent discovery responses in a civil action. In dismissing the § 1962(c) claim, the Third Circuit concluded that:

If Averbach's allegations are true, no more occurred with respect to the enterprise than to mislead those who conducted it. That, in our view is not participation in its affairs which is required by 18 U.S.C. § 1962(c).

*Averbach,* 809 F.2d at 1018. The Court also noted that in order to state a claim under subsection (c), the plaintiffs therein would typically have had to allege that the defendant had infiltrated or corrupted the court's processes.

Despite the obvious similarities of *Averbach* to the present case, plaintiffs argue that reliance on *Averbach* herein would be inconsistent with the Third Circuit's opinion in *United States v. Provenzano,* 688 F.2d 194 (3rd Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1987). We do not, however, perceive any inconsistency. In *Provenzano,* the court was faced with an *insider* of an enterprise, who was alleged to have conducted the affairs of the enterprise through a pattern of racketeering activity. The court therein adopted the following two-prong alternative test articulated in *United States v. Scotto,* 641 F.2d 47 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), which also dealt with an *insider:*

[O]ne conducts the activities of an enterprise through a pattern of racketeering when:

(1) One is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involve-

ment in or control over the affairs of the enterprise; or

(2) The predicate offenses are related to the activities of that enterprise.

*Provenzano,* 688 F.2d at 200.

Unlike *Provenzano,* in *Averbach* as well as the present case, the "person" alleged to have conducted the affairs of the "enterprise," was an *outsider* of the enterprise. The court recognizing this distinction, therefore concluded in *Averbach* that an *outsider* "conducts" the affairs of an enterprise through a pattern of racketeering activity related to the affairs of the enterprise, if and only if the predicate racketeering acts are part of a corruption of the enterprise's own internal processes.

Because plaintiffs' amended complaint merely alleges that Borden defrauded the plaintiffs, rather than alleging any "conduct" of the enterprise's *own* affairs through a pattern of racketeering activity; we conclude that plaintiffs' § 1962(c) claim in Count Eight of the amended complaint must be dismissed.

IV. *Count Nine—Section 1962(c) Claim*

In Count Nine of their amended complaint, plaintiffs assert an additional claim under § 1962(c). For the purposes of this count, plaintiffs list Borden, some of its employees, and its advertising agency as the "enterprise" whose affairs were conducted by Borden (the "person") through a pattern of racketeering activities. Borden seeks to dismiss this count arguing that it cannot be both the "person" and "enterprise" in a § 1962(c) claim. *Hirsch v. Enright Refining Co.,* 751 F.2d 628 (3rd Cir. 1984).

■ Plaintiffs do not dispute that under § 1962(c), the "person" and the "enterprise" must be distinct. They assert instead that since the "enterprise" is pled as an association in fact of Borden, some of its employees, and its advertising agency, it is distinct from Borden the "person." We do not agree. As a corporation, Borden is a legal entity which cannot act except through its employees and other agents. Therefore, as Borden argues in its brief, "any association between Borden and its agents in connection with the operation of the corporation is no more or less than the corporation itself." As the court noted in *Yellow Bus Lines Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 883 F.2d 132 (D.C.Cir.1989):

an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself.

*Yellow Bus,* 883 F.2d at 141. To accept plaintiffs' assertion of a distinct enterprise herein, would therefore be inconsistent with the Third Circuit's recognition in *Pro–Tech, Inc. v. Western Co. of North America,* 824 F.2d 1349 (3rd Cir.1987) that:

§ 1962(c) was intended to govern only those instances in which an "innocent" or "passive" corporation is victimized by the RICO "persons," and either drained of its own money or used as a passive tool to extract money from third parties ...

§ 1962(c) enterprises may not be forced to make whole the third parties which were victimized along with or through the enterprise.

*Pro–Tech,* 824 F.2d at 1359. *See also, Tarasi v. Dravo,* 613 F.Supp. 1235 (W.D.Pa. 1985).

We do recognize that an entity may sometimes be both an innocent victim of *certain* racketeering activity, and a perpetrator of *other* such activity. *See, Rose v. Bartle,* 871 F.2d 331 (3rd Cir.1989). The plaintiffs do not argue and the facts do not support such an assertion herein, however. To the extent that Borden can be said to be a victim, it was victimized only by its own actions. For this reason, Count Nine of plaintiffs' amended complaint must be dismissed.