**UNITED STATES of America**

v.

**Dean K. FELTON, Nancy E. Bruce, John Zorak a/k/a Johnny, Anthony Serrao a/k/a Buddy, Richard Cox a/k/a Ricky, James Thurman, John Hathorne.**

**Crim. No. 83–49.**

United States District Court,
W.D. Pennsylvania.

May 18, 1984.

Linda Kelly, Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

W. Thomas McGough, Jr., Pittsburgh, Pa., for Dean K. Felton.

Kim William Riester, Pittsburgh, Pa., for Nancy E. Bruce.

Robert C. Gallo, Pittsburgh, Pa., for John Zorak.

Charles F. Scarlata, Pittsburgh, Pa., for Anthony Serrao.

Stephen M. Sokol, Pittsburgh, Pa., for Richard Cox.

Dennis Clark, Pittsburgh, Pa., and William Schiller, Atlanta, Ga., for James Thurman.

Robert Eddins, Pittsburgh, Pa., for John Hathorne.

## MEMORANDUM OPINION

DIAMOND, District Judge.

Presently before this Court are a number of pretrial motions filed by the several defendants in the above-captioned case. The motions will be considered by defendant, although some overlap does exist.

## I

### DEFENDANT FELTON

Defendant Dean K. Felton has moved to dismiss the following counts on the following grounds: (1) Counts One and Two as violative of his statutory right to a speedy trial; (2) Counts One through Ten as violative of his constitutional right to a speedy trial and as unconstitutionally vague; and (3) all but one of Counts Three through Seven and Ten as impermissibly multiplicitous.

After reviewing the defendant's motions, the two indictments involved, and the briefs of the defendant and the government, this court concluded that the defendant had made a prima facie nonfrivolous claim that Counts One and Two of the instant indictment at Criminal No. 83–49 were the same as, or required to be joined with, those contained in Count One of an earlier indictment filed at Criminal No. 79–121. In order to resolve the genuine issues raised under the Speedy Trial Act of 1974 (hereinafter sometimes the "Act"), 18 U.S.C. §§ 3161–3174 (1982), a hearing was held. See United States v. Novak, 715 F.2d 810 (3d Cir.1983), cert. denied, —— U.S. ——, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); United States v. Inmon, 568 F.2d 326 (3d Cir.), cert. denied, 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1977). From that hearing held on July 14 and 15, 1983, the following facts appear.

On June 4, 1979, federal agents executed a search warrant at the premises of Antiques International in Plum Borough, Pennsylvania, and recovered quantities of marijuana from the premises and from two vehicles found there. Seven people were arrested at that time: Dean Felton, Keith Felton, Angelica Felton, Gary Golden, Robert Wilson, John Bokros, and Patricia Dick.

On June 28, 1979, a federal grand jury sitting in this district returned a four count indictment against those individuals at Criminal No. 79–121. Count One charged a conspiracy among the seven defendants in violation of 21 U.S.C. § 846, which allegedly began on or about May 24, 1979, and which continued up to the date of the arrest, June 4, 1979. Seven overt acts were specified, and it was alleged that the named defendants also had conspired with "others to the grand jury unknown." Counts Two and Three charged Keith Fel-

ton, Angelica Felton, John Bokros, and Gary Golden with possession with intent to distribute the marijuana which had been seized from the automobiles. And Count Four charged Dean Felton, Robert Wilson, and Patricia Dick with possession with intent to distribute the marijuana found on the business premises of Antiques International.

On January 9, 1980, the Honorable Paul A. Simmons of this court, to whom that case had been assigned, entered orders disposing of all pretrial motions, including orders suppressing the evidence seized from the vehicles on June 4, 1979.

The government appealed from the suppression orders, but when the orders were affirmed on appeal, it moved to dismiss Counts One, Two, and Three of the indictment at 79–121 "for the reason that the interests of justice no longer necessitate further prosecution" on those counts. That motion was granted, leaving Count Four outstanding, which named only Dean Felton, Patricia Dick and Robert Wilson as defendants. On May 11, 1981, Robert Wilson [1] and Patricia Dick pleaded guilty to the remaining count, and a jury trial commenced as to Dean Felton. That trial ended on May 21, 1981, with a verdict of guilty.

On May 13, 1981, Pennsylvania state police executed two search warrants, one at a warehouse leased to Dean Felton in Pittsburgh, Pennsylvania, at a place known as the Kutz Industrial Park, and the other at a residence located at 225 Sagamore Avenue, Pittsburgh, Pennsylvania. The state police found and seized 12,410 lbs. of marijuana in a truck at the warehouse and 947 lbs. of marijuana in the basement of the home on Sagamore Street.

On May 14, 1981, during the trial at Criminal No. 79–121, Dean Felton was arrested by state authorities. He was charged by the Commonwealth of Pennsylvania with possession of marijuana, possession of marijuana with intent to distribute, and conspiring with one James Constantine

to distribute marijuana. These charges related to the marijuana seized at the Kutz Industrial Park. Also charged on that day were James Constantine and Alma and Emily McCaffery, occupants of the Sagamore Avenue house.

On July 1, 1981, Judge Simmons sentenced Dean Felton at Criminal No. 79–121 to five years in the custody of the Attorney General, fined him $10,000, imposed a special parole term of twenty years, and revoked his bond pending appeal.

On July 15, 1981, the Allegheny County, Pennsylvania, District Attorney filed criminal informations against Dean Felton, James Constantine, Alma McCaffery and Emily McCaffery. All four defendants were charged with possession of marijuana and possession of marijuana with intent to deliver, and Dean Felton and James Constantine also were charged with conspiring, on or about May 13, 1981, to possess 12,410 lbs. of marijuana. All four informations were scheduled for a joint trial to commence on September 21, 1981.

On September 17, 1981, however, the District Attorney moved to continue the impending trial, stating:

> The Commonwealth of Pa., at the request of the U.S. Attorney's Office has transferred this investigation and subsequent prosecution to the U.S. Attorney's Office but as of this date indictments have not been returned against these defendants by the Federal Grand Jury. The Federal Government is actively pursuing this investigation and will prosecute the above named individuals for the same criminal conduct as charged by the Commonwealth.

The motion was granted and trial was rescheduled to commence on October 29, 1981, but on October 23, 1981, all four informations were dismissed on motion of the District Attorney. In support of those motions, the District Attorney stated that "prosecution in this case is being assumed by the United States Attorney's Office."

---

1. Robert Wilson died on May 26, 1981.

Dean Felton, who was in custody, learned of the dismissal of the state charges on October 30, 1981, and promptly filed an objection to that dismissal. In his objection, he alleged that the dismissal of the state charges in anticipation of federal prosecution violated his state and federal rights to a speedy trial. He demanded that the court vacate the dismissal and order those charges to proceed to trial. The motion was denied.

On March 31, 1983, shortly after Dean Felton had been released from federal custody under the sentence imposed on July 1, 1981, the instant ten-count indictment was returned. Count One of that indictment charges that Dean Felton, Nancy E. Bruce, John Zorak, Anthony Serrao, Richard Cox, James Thurman, John Hathorne, "and others to the grand jury known and unknown," conspired "from on or about the beginning of 1979 through on or about May 13, 1981," to distribute marijuana in violation of 21 U.S.C. § 846. Count Two charges that in violation of 21 U.S.C. § 848 Dean Felton, "in concert with at least five other persons," engaged in a "continuing criminal enterprise" over the same time period as the conspiracy charged in Count One.

Counts Three through Seven charge Dean Felton with possession with intent to distribute unspecified quantities of marijuana at various times from "in or about the spring of 1979" to on or about the "early part of 1980."

Count Eight charges that on or about October 31, 1980, Dean Felton and Anthony Serrao unlawfully did use an interstate communication facility in furtherance of the conspiracy charged in Count One, in violation of 21 U.S.C. § 843(b). Count Nine is identical to Eight, except that Nine charges Dean Felton and Richard Cox as defendants.

Finally, Count Ten charges Dean Felton and Nancy Bruce with possessing with intent to distribute the 12,000 pounds of marijuana (apparently that allegedly found at the Kutz Industrial Park on May 13, 1981) in violation of 21 U.S.C. § 841(a)(1).

### Speedy Trial Act

The defendant Felton contends that Counts One and Two of the instant indictment charge the "same offense or one that was required to be joined with" the conspiracy count earlier charged at Criminal No. 79–121, and that under § 3161(h)(6) of the Speedy Trial Act the time which elapsed under the first indictment prior to its dismissal must be "tacked" on to the present indictment. If this is done, the defendant argues, the statutory period of seventy days within which trial must commence on the instant indictment will have passed, and, therefore, Counts One and Two should be dismissed.

The government responds that the first indictment was returned in June of 1979, prior to the effective date of the mandatory dismissal sanctions of the Act which applied only to those indictments filed on or after July 1, 1980, 18 U.S.C. § 3163(c). Therefore, the government argues, since the mandatory dismissal sanctions did not apply to the first indictment at all, if the charges contained in Counts One and Two of the second indictment are in fact, as the defendant contends, the same as, or charges which should have been joined with, those contained in the first indictment, the date of the first indictment would control and no sanctions at all would apply to Counts One and Two of the second indictment.

The government contends in the alternative, however, that the conspiracy count of the second indictment is not in fact the same as, or one which should have been joined with, the conspiracy count in the first indictment, and, therefore, no "tacking" is required in any event. Finally the government argues that even if we add the days which have run under the first indictment to those chargeable under the second, the permissible statutory period has not been exceeded.

The general principles which govern our disposition of this motion appear to be as follows. In determining whether a sub-

sequent indictment does in fact charge the same offense or one which was required to be joined with an offense charged in a previous indictment, we employ double jeopardy tests. In other words, "we must determine whether, within the meaning of the Double Jeopardy Clause, the charges contained in the superseding indictment are the same as, or required to be joined with, charges contained in the original indictment." *Novak,* 715 F.2d at 817. "Offenses are the 'same' for double jeopardy purposes when the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other." *United States v. Mallah,* 503 F.2d 971, 985 (2d Cir.1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). Further, "[i]n the context of multiple charges of conspiracy under the same statute, the United States Supreme Court has held that 'a single agreement to commit an offense does not become several conspiracies because it continues over a period of time. *Braverman v. United States,* 317 U.S. 49, 52, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942).'" *Novak,* 715 F.2d at 817.

■ It is important to bear in mind when considering whether or not one or two conspiracies have been charged that "[i]t is the agreement which constitutes the crime, not the overt acts." *United States v. Young,* 503 F.2d 1072, 1076 (3d Cir.1974). In addition, as stated in *Young,* "[p]roper weight must be given to consideration of whether the overt acts alleged in the first conspiracy charge were carried out in furtherance of the broad agreement alleged in the second indictment or whether these acts were carried out in furtherance of a different agreement." *Id.*

■ Where, as here, a defendant makes a prima facie showing that a second indictment charges the same offense as, or one required to be joined with, charges contained in a previous indictment, the government must prove by a preponderance of the evidence to the court as the trier of fact that the offenses are separate. *See supra* at 568 F.2d at 332.

■ With regard to the continuing criminal enterprise in violation of 21 U.S.C. § 848 charged in Count Two of the second indictment, the predicate conspiracy in violation of 21 U.S.C. § 846 is a lesser included offense. *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *United States v. Lurz,* 666 F.2d 69 (4th Cir.1981), *cert. denied,* 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982). And *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), establishes the general rule that the Double Jeopardy Clause prohibits a state or the federal government from trying the defendant for a greater offense after it has convicted him of a lesser included offense. It follows, therefore, that the continuing-criminal-enterprise-charge must be joined with its predicate conspiracy under double jeopardy standards.

■ Having reviewed the conspiracy counts of the indictments in question in the light of the foregoing principles and the evidence which was adduced at the hearing, we find the following facts which we believe require the conclusion that the government has failed to rebut the presumption raised by the defendant's prima facie case that the conspiracies are the same:

(1) The principal actor in the two conspiracies as well as in the continuing criminal enterprise as charged by the government is the defendant Dean K. Felton.

(2) The conspiracy charged in the second indictment spans a period of time which completely encompasses the time charged in the conspiracy in the earlier indictment.

(3) The principal location of the criminal activity is the same in both conspiracies, Pittsburgh, Pennsylvania.

(4) The alleged conspiracy in the first indictment arises out of activities at Antiques International and is a component of the conspiracy charged in the second indictment.

(5) The conspiracy at Criminal No. 79–121 includes the named defendants "and others to the grand jury unknown" and the conspiracy at Criminal No. 83–49 includes the named defendants "and others to the grand jury known and unknown."

(6) Both conspiracies involved an agreement "to distribute and possess with the intent to distribute marijuana."

(7) At the July, 1983, hearing, a DEA Agent, Larry J. Carroll, testified, and we find as a fact, that the individuals involved in those overt acts charged at No. 83–49 which ante-date the overt acts at No. 79–121 were in fact the same individuals who were charged in No. 79–121; to-wit, Dean Felton, Keith Felton, Robert Wilson, and Angelica Felton.

(8) Further, at least one of these same conspirators was involved in some of the overt acts at No. 83–49 which post-dated the conspiracy dates charged at No. 79–121, specifically, Robert Wilson appears in No. 83–49 in overt acts 4, 5, 6, 8, 9, 18, 19, 20, 23 and 24. In all, Robert Wilson, a co-conspirator at No. 79–121, and, obviously, a known but unnamed co-conspirator at No. 83–49, appears in overt acts in No. 83–49 which span a period which ante-dates by several months the former indictment dates and which continue through April 3, 1981, one month prior to the final date charged in the second indictment.

Finally, as to overt acts 8 and 9 at No. 83–49, Agent Carroll testified, and we find as a fact, that the same Robert Wilson dealt with one or more of those named as conspirators at No. 83–49: Overt Act 8 (Hathorne), Overt Act 9 (Dean Felton, Hathorne).

It seems fair to conclude, therefore, that the conspiracies alleged in the two indictments are one and the same and that Dean Felton engaged in a single conspiratorial agreement to possess with the intent to distribute marijuana with one or more of the alleged conspirators charged in both indictments.

■ Furthermore, it also appears fair to conclude as to Count Two at Criminal No. 83–49, where Dean Felton is charged with being the principal in a continuing criminal enterprise, that this enterprise included the conspiracy charged at Count One of both of the indictments in question and that this conspiracy was a lesser included offense of the continuing criminal enterprise charge, and that, therefore, in accordance with the foregoing principles, was, in effect, one which should have been joined in the first instance for double-jeopardy-Speedy-Trial-Act consideration.

■ Having thus concluded as the defendant has urged and the law and the facts support, that the conspiracies charged in both indictments are the same offense, the next question becomes whether the nonexcludable time which is chargeable to Criminal No. 79–121 should be "tacked" to Criminal No. 83–49.

The government argues that since the first indictment was returned prior to the effective date of the mandatory-dismissal-sanctions of the Act, the time limits and, indeed, the sanctions that were applicable under the Act when the indictment at Criminal No. 79–121 was returned control. It cites in support of this proposition *United States v. Budzyna*, 666 F.2d 666 (1st Cir. 1981). There, the First Circuit in construing the Act in conjunction with the implemental plan adopted by the District of Massachusetts, which expressly provided that the original indictment date determined the applicable Speedy Trial Act time limits for the commencement of trial, held that not only would the date of the original indictment determine the time period within which trial must commence but also would determine "the applicability of sanctions under section 3162." *Id.* at 670. *See also United States v. Salmon*, 504 F.Supp. 1270 (S.D.Tex.1981), citing *United States v. Barboza*, 612 F.2d 999, 1000, n. 2 (5th Cir.1982).

Under the *Final Plan Pursuant to the Speedy Trial Act of 1974 adopted* in this district on May 23, 1980, at Section II, 4(f)(5), it is provided:

In the event that a complaint, indictment, or information is filed against a defendant charged in a pending indictment or information or in an indictment or information dismissed on motion of the United States Attorney, the trial on the new charge shall commence within the time limit for commencement of trial on the original indictment or information unless the court *finds that the new charge is not for the same offense charged in the original indictment or information or an offense required to be joined therewith.* (emphasis added).

It appears, therefore, that since the court has found that the conspiracies in the two indictments are one and the same and that the "conspiracy" is a lesser included offense of the continuing criminal enterprise charged at No. 83–49, the non-sanction and time-limit provisions of the Act which applied when the indictment at Criminal No. 79–121 was returned in June of 1979 control, and no sanctions are applicable, 18 U.S.C. § 3163(c), § 3174(c). *Budzyna*, 666 F.2d at 670–71.

Notwithstanding the foregoing, in order that there be a complete record for appeal purposes, we make the following Speedy-Trial-Act-calculations as to the indictment at No. 79–121. We are, of course, assuming *arguendo* that there is "tacking", since otherwise this is all irrelevant.

■ For purposes of our analysis and calculations, the time interval from indictment to trial began on the date the indictment at No. 79–121 was returned, since, as we indicate below, the defendant was arrested on the charges prior to the return of the indictment, and the indictment was timely returned within the 30-day period following the defendant's arrest. 18 U.S.C. § 3161(b).

The defendant was arraigned on July 6, 1979, therefore eight nonexcludable days had run between June 28, 1979 and July 5, 1979 with July 6, 1979, (one day) being excluded under 18 U.S.C. § 3161(h)(1). [All further references are to subsections of 18 U.S.C. § 3161 unless otherwise initiated.]

■ On July 13, 1979, a conference was held before Judge Simmons who granted an extension of time for the filing of pretrial motions.[2] During the period from July 13, 1979, to January 3, 1980, numerous motions were filed by the defendants and hearings or oral arguments thereon held by Judge Simmons. Those motions were disposed of on January 9, 1980. We find, therefore, that the same six-day period from July 7 to July 12, 1979, is nonexcludable and that the 181 days from July 13, 1979, to January 9, 1980, is excludable under (h)(1)(F) and (h)(1)(J).

■ An interlocutory appeal was taken by the government on January 15, 1980. The five days between the disposition of the motions on January 9, 1980, and the filing of the notice of appeal by the government on January 15, 1980, are nonexcludable, but the 338 days between January 15, 1980, and December 17, 1980, when a certified copy of the Judgment Order was received from the Court of Appeals and filed by our Clerk of Court are excludable under (h)(1)(E).

■ Judge Simmons entered an order on December 19, 1980, scheduling the trial for January 26, 1981. The defendant Felton and others filed a motion to continue on January 16, 1981, which was granted orally after a hearing on that date,[3] and on January 20, 1981, the court entered a written

**2.** After an intensive hearing was held by the court, it made findings of fact in support of its conclusion that an enlargement of time for pretrial preparation was necessary in the interests of justice, which was concurred in by all counsel, and then entered an order under 18 U.S.C. § 3161(h)(8)(A) enlarging the times for filing motions as indicated in the text above, which also was concurred in by all counsel. *See* transcript of hearing of July 13, 1979, pp. 7–23, Clerk's docket No. 19 at Cr. No. 79–121.

**3.** *See* hearing memo of January 16, 1981, hearing, Clerk's docket No. 91 at Cr. No. 79–121.

order continuing the trial on defendant's motion until April 28, 1981, in the interests of justice under (h)(8)(B).[4] Jury selection began on May 11, 1981, thus concluding the Speedy Trial Act clock for Criminal No. 79–121. The 29 days which elapsed between the filing of the Judgment Order by the Court of Appeals on December 17, 1980, until the filing of, and hearing on the defendants' motion for continuance on January 16, 1981, is nonexcludable, while the 116 days from that date to jury selection on May 11, 1981, is excludable under (h)(8)(B)(i).

The court finds from the record at Criminal No. 79–121 that 24 days elapsed during the interval between defendant Felton's arrest and terminated with the return of the indictment at Criminal No. 79–121. This was timely under § 3161(b), and is not included in the time-to-trial calculations. During the second interval, from the return of the indictment to the commencement of jury selection, there were a total of 48 nonexcludable days and 636 excludable days under the various sections of 18 U.S.C. § 3161 previously cited. Under a "tacking" theory, and assuming that the current Act times apply, those 48 days would have to be deducted from the 70 days within which trial must be commenced at Criminal No. 83–49, so that there would remain only 22 days available for use at that number.

█ Notwithstanding the foregoing, a total of 70 days have not elapsed at No. 83–49, since we believe that all of the time that transpired from the return of the indictment at that number to March 21, 1984, when defendant Richard F. Cox first appeared before a judicial officer of this court following his arrest in Florida on February 29, 1984, as a fugitive in this case, is excludable, because while that defendant remained in a fugitive status and not severed as a defendant the time was excluded as to him and all of his co-defendants. 18 U.S.C. § 3161(h)(3)(A) and (h)(7); *Novak*, 715 F.2d at 821.

In fact on November 3, 1983, we entered an order, which we believe was in timely compliance with the instructions of the Circuit set forth in *Novak*. In that order we stated the reasons why we were holding as excludable all of the time necessary for the disposition of the numerous and complex motions filed in this case and we concluded with the observation that in any event time was not running because one of the indicted co-conspirators had been in a fugitive status since the return of the indictment. That order apparently motivated counsel for defendant Felton to file a motion on November 21, 1983, to sever the defendant Cox. Prior to that time no other motion to sever Cox had been made by any of the defendants, and in our judgment no time at all had run under the Speedy Trial Act at Criminal No. 83–49.

The defendant Felton argues, however, that the time excludable under subsection (h)(7) when a defendant is joined for trial with a co-defendant as to whom the time for trial has not run and no motion for severance has been granted is by the terms of that subsection itself limited to a reasonable time. The Third Circuit addressed this precise point in *Novak*, 715 F.2d at 814–815 and noted at page 814 that "[t]he legislative history of section 3161(h)(7) illustrates a strong congressional preference for joint trials and an intention that delays resulting from the joinder of codefendants be liberally excluded." The Circuit pointed out that a House version of the Speedy Trial Act bill then under consideration indicated a preference for severance, but that ultimately this was resolved by the present language of (h)(7) and that Congress thus "reaffirmed its intent that the joinder exclusion be expansively construed." *Id.* The Circuit then concluded at page 815:

We believe that section 3161(h)(7) represents a congressional effort to build into the Speedy Trial Act sufficient flexibility to allow the government to stop criminal activity by arresting the suspected perpetrators as soon as it has probable cause, without precluding a

4. *See* order of January 20, 1981, Clerk's docket No. 92 at Cr. No. 79–121.

joint trial with compatriots who may be apprehended at a later date. We believe that it is consistent with this congressional intent to apply section 3161(h)(7) so that, after defendants are joined for trial, "an exclusion applicable to one defendant applies to all codefendants," [*U.S. v.*] *Edwards, supra,* 627 F.2d [460] at 461 [D.C.Cir.1980], subject to the reasonableness constraint.

Moreover, the Circuit held that "Congress also intended subsection (h)(7) to be used in conjunction with other exclusions, so that, for example an exclusion under subsection (F) applicable to one defendant would, by virtue of subsection (h)(7), be applicable to all his codefendants." *Id.* 715 F.2d at 815.

■ In view of the strong congressional policy in favor of the joint trials, the adoption of that policy by the Third Circuit in *Novak,* the manifest wisdom of this policy, the obvious fact that one trial of this case will take approximately three to four weeks, that an additional trial or trials would involve many duplications with the first, the general desirability "to have all of the parties tried together so that the full extent of the conspiracy may be developed," *United States v. Provenzano,* 688 F.2d 194, 199 (3d Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982), the multitude and complexity of the motions already before this court, and all the circumstances involved herein, the court believed in November, 1983, and believes now, that a reasonable further delay pending the apprehension of the defendant Cox was reasonable. Indeed, it appears that this relatively brief additional delay (much, if not all, of which was excludable in any event because of the pendency of these existing, as well as subsequently filed, motions) has in fact resulted in the ultimate savings of judicial time and expense, since in the interim the defendant Cox was apprehended and will be available for trial upon the expiration of the 30-day period from his first appearance before a magistrate of this district, § 3161(c)(2).

We find it unnecessary to consider each of the reasons cited by the defendant Felton as to why he will be prejudiced by this delay. No one of them is persuasive by itself, nor do they collectively outweigh the reasons in support of a single joint trial. Certainly, if it develops at trial that Mr. Felton has suffered a prejudice as a result of delay the matter may be reconsidered at that time and appropriate relief granted.

Because of the foregoing rulings, we find that it is unnecessary here to make any Speedy Trial Act calculations from November 21, 1983, the date of defendant Felton's motion to sever defendant Cox. We note, however, that that very motion as well as a number of other motions by the defendant Felton and the other defendants along with responses thereto which have been filed since November 21, 1983, (indeed as recently as April 17, 1984) have resulted in additional delay and the resultant exclusion of Speedy-Trial-Act-time. See *Novak,* 715 F.2d at 813.

Therefore, the defendant's motion to dismiss will be denied.

*Constitutional Right To Speedy Trial*

Defendant Felton next contends that his Sixth Amendment right to a speedy trial has been violated and that all charges at Criminal No. 83–49 should be dismissed. Arguing the factors that should be balanced as set forth in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the defendant claims: (1) the delay of eighteen months between his arrest on state charges and the federal indictment was excessive, (2) there was no legitimate reason for the delay, (3) he asserted his right to speedy trial at the time of the dismissal of the state charges, and (4) he is prejudiced because he could not prepare his defense while in federal prison, memories of witnesses are fading, and the delay has prevented him from serving concurrent sentences.

■ It is undisputed that Felton was in federal prison serving the sentence on his conviction at Criminal No. 79–121 during the period between the dismissal of the

related state charges and the return of the instant indictment. The record indicates that the instant indictment was returned on March 31, 1983, that a warrant for Felton's arrest was issued on the same day, and that Felton made his initial appearance before a magistrate of this district on April 1, 1983. Thus, the earliest date that he became an accused in this case was March 31, 1983, the date that the indictment was returned, and that, likewise, was the earliest date that his Sixth Amendment right to a speedy trial commenced. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

■ Even if we accept the defendant's assertion that there has been an eighteen month delay, we do not find the length of that delay excessive under the circumstances of this case. While a fifteen-month delay could not be condoned in *United States v. Cabral*, 475 F.2d 715 (1st Cir.1973), eighteen months does not appear to be unreasonable here because of the greater complexity of these federal charges and the obvious need to conduct a thorough and wide-ranging investigation covering several states. *United States v. Mejias*, 552 F.2d 435 (2d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977).

For the foregoing reasons, we find that there has been no delay to which Felton can object, but even if we were to find an eighteen month delay, applying the test of *Barker v. Wingo, supra,* we would nevertheless reject defendant's claim that his Sixth Amendment right to a speedy trial has been violated.

### Motions To Suppress

#### 1. *Kutz Industrial Park*

On May 13, 1981, pursuant to a search warrant, state police searched Building 13 of the Kutz Industrial Park, Pittsburgh, Pennsylvania, and seized six and a half tons of marijuana. The defendant challenges the sufficiency of the affidavit upon which the warrant was based and also contends that the affidavit contained material misrepresentations without which there could have been no showing of probable cause. More particularly, the defendant argues that the informant's report of a discovery of marijuana was not credible, that Mr. Macek, Manager of the Kutz Industrial Park, did not make certain statements to the affiant as affiant alleges, and that the affiant did not have personal knowledge that Felton previously had been arrested for possession of marijuana "in large quantities."

■ We find that under the tests of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), there was substantial bases for the magistrate's conclusion that there was a fair probability that contraband would be found in the warehouse leased to defendant Felton at the Kutz Industrial Park. First, the informant made significant statements against his own penal interests, thus providing a sufficient basis to conclude that he was credible. The defendant admits that the statement of the informant about his attempted burglary was a statement against his interest, but argues that reference to the discovery of the marijuana was not. As we view it, however, the reference to the discovery of the marijuana was part of the overall admission of the informant to burglary and that therefore the entire statement constituted a statement against the informant's penal interest.

Second, we find that Mr. Macek's observations, whether considered independently of the informant's tip, as a "circumstance" under the *Gates* test, or considered in relation to the credibility of the informant under *Aguilar*, strengthened both the probability that contraband would be found and that the informant was reliable. (See Tr. July 14–15, 1983, hearing at pp. 180–184). Even if, *arguendo*, the manager's observations taken in isolation were insufficient bases from which to draw an inference that criminal activity was afoot, his observations did link the defendant and a rental van with a similar rental van in which marijuana was observed by the informant.

*Gates,* —— U.S. at n. 13, 103 S.Ct. at n. 13, 76 L.Ed.2d at n. 13.

Third, we find that the affiant's knowledge of Felton's prior arrest for possession of marijuana also supports the credibility of the informant. *Id.* The defendant cites us to *United States v. Canestri,* 518 F.2d 269 (2d Cir.1975). That case held that a prior arrest was at least a factor which the magistrate could consider, although alone the factor would be insufficient to justify a warrant.

■ Finally, the defendant argues that there were misstatements in the affidavit without which there could have been no showing of probable cause. The alleged misstatements are (1) that there was an attempted burglary, (2) that Mr. Macek had seen Felton only at night, observed suspicious activity, and remembered a van of a particular color, and (3) that affiant knew of Felton's prior arrest for large quantities of marijuana. Bearing in mind that these affidavits are prepared by lay police officers who cannot be expected to employ the precise terminology of a lawyer drafting a legal document, and after the defendant's affidavits relative to interviews of Mr. Macek, and Mr. Macek's testimony itself, we do not believe the defendant has met his burden of proof under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The defendant failed to establish that Mr. Macek did not in fact make significant material statements to the police upon which they relied in applying for the search warrant (*see* Tr. hearing of July 14–15, 1983, at pp. 172–173), or that the police uttered deliberate falsehoods or demonstrated a reckless disregard for the truth in their affidavits to the issuing magistrate.

For the foregoing reasons and those stated by the court on the record of the hearing on July 14 and 15, 1983, the motion to suppress will be denied. (*See* Tr. of that hearing at pp. 180 ff., Clerk's Docket No. 136 at Cr. 83–49.)

### 2. *Rent-A-Spot, Allegheny Valley*

The defendant Felton also challenges a search at Allegheny Valley Rent-A-Spot pursuant to a search warrant which was based upon essentially the same information as the *Kutz warrant.* The defendant's objections to this search are the same as those concerning the search at Kutz Industrial Park. Accordingly, this motion will be denied for the reasons stated above.

### 3. *Rent-A-Space, Pitcairn*

The defendant's objections to this search were premised on the belief that the search was conducted without a warrant. The government produced a warrant, and the defendant has not challenged it. Therefore, the defendant's motion to suppress the Pitcairn search will be denied.

### 4. *Utah Searches*

Two warrantless searches in Salt Lake City, Utah, one at a residence, the other at a "Rent-A-Space", were conducted by Quality Properties ("Quality"), a firm hired by Felton to serve as "manager" of the subject properties. The searches, which were conducted in the presence of Utah police authorities, uncovered various items including a small quantity of a controlled substance, a tape recording of a telephone conversation between defendant Felton and the defendant Serrao, and a tape of a conversation between the defendant Felton and the defendant Cox. The defendant Felton now seeks to suppress those items on the grounds that the search was in violation of his Fourth Amendment rights because Quality did not have his authorization to conduct or to consent to a search and that, in the alternative, the search went beyond the scope of any consent or authority.

■ The court finds that the searches did not implicate the Fourth Amendment because they were in fact private searches motivated by legitimate reasons which did not involve governmental action. *United States v. Jacobsen,* —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *United States v. Gomez,* 614 F.2d 643 (9th Cir.1979). We find from testimony at the July, 1983, hearing that the Utah authorities were present at the

search areas at the request of Quality, and that the searches were initiated by a request received by Quality from defendant Nancy Bruce to ship Bruce's clothing and personal effects stored in the two storage areas to her. This request implicitly authorized a search of the areas in which clothing and personal effects would be found, since these items were mixed among various other items also stored at those places.

The court finds that (1) Quality had the responsibility of managing and maintaining the properties of defendant Felton at which defendant Bruce's effects were stored (Tr. I, p. 325),[5] (2) Mr. Fleming, broker/president of Quality, was contacted by Agent Steven Todoric, II, of the Pennsylvania Office of Attorney General, Bureau of Narcotics Investigations and informed that defendant Felton was being investigated (Tr. I, p. 333), (3) Todoric did not suggest that Fleming search the properties (Tr. I, p. 334), (4) Mr. Fleming was not pressured into consenting to the presence of the Utah authorities (Tr. I, p. 353–354), (5) Mr. Fleming, in order to protect the interests of Quality, requested the presence of the authorities, and had his agent, Mr. Woods, conduct the search for defendant Bruce's belongings (Tr. I, p. 356), (6) the Utah authorities did not instruct Mr. Woods as to how to conduct the search (Tr. II, p. 45), and (7) Mr. Woods searched the contents of the storage areas and it was he, acting in a manner consistent with his understanding of his employer's instructions, who offered items other than clothing for the perusal of the officers. They did not request to see or inspect any specific item. (Tr. II, pp. 5–7, pp. 24–25). Thus, the officers' role in the search was passive, *United States v. Sherwin*, 539 F.2d 1 (9th Cir.1976); *see also, Jacobsen, supra.*

■ Even if these were "Fourth Amendment" searches, however, we find that the officers were present at the search areas with the consent of Quality and that Quality had the authority to give consent.

This authority had two independent bases. First, Quality was hired by Felton to manage and maintain the properties (Tr. I, p. 325); this included collecting rents and showing the premises to prospective renters. Thus, Quality had authority based on contract to act on behalf of Felton as his agent. Second, Quality had authority based simply on the fact that it shared with Felton a general access to the properties. *United States v. Matlock*, 415 U.S. 164, 171 at n. 7, 94 S.Ct. 988, 993 at n. 7, 39 L.Ed.2d 242 (1974). Felton had given Quality keys to the areas. *United States v. Murphy*, 506 F.2d 529 (9th Cir.1974), *cert. denied*, 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975). Applying the "totality of circumstances" test of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), we find that Quality had the authority to consent to the search by Utah officials, if such a request had, in fact, been made. By giving Quality keys, and by contract, Felton assumed the risk that Quality would stumble upon the contraband and turn it over to authorities, consent to a search of the areas, or even take the initiative and request the presence of authorities while it exercised its responsibilities in the storage areas.

We here deny defendant Felton's motion to suppress the *physical* items seized during the "Utah" searches. We subsequently will address the issue more clearly raised by defendant Serrao concerning the "search" of the *contents* of the physical tapes seized. That matter is treated under our discussion of defendant Serrao's motion to suppress.

### *Boring Papers*

■ Defendant Felton has moved to suppress information he gave to one Terry Boring on the grounds that this information was given by defendant Felton for the purpose of initiating an attorney/client relationship with attorney David Schrager. This information was turned over to

---

**5.** References to hearing of July 14–15, 1983, are indicated by Tr. I and to the hearing of July 28, 1983, as Tr. II.

government officials, Felton contends, by Boring after he was bribed by promises made by those officials to place Boring, a drug addict, into a drug rehabilitation program.

We will deny this motion. It is undisputed that Boring was a lay person and we find, therefore, that defendant Felton did not have a reasonable expectation of an attorney/client privilege in the materials that he turned over to Boring. *In re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir.1979); *United States v. United Shoe Mfg. Co.*, 89 F.Supp. 357 (D.Mass. 1950). The record reveals that while Boring was asked to "check out" several attorneys, Boring was given the files in question and was hired at $250.00 a week to perform various other tasks for Felton (Tr. I, pp. 207, 224), pursuant to which he was given Felton's power of attorney. (Tr. I, p. 210–11). We find that Felton and Schrager never entered into an attorney/client relationship (Tr. I, pp. 201, 218), nor did Felton give the files to Boring in expectation of or in preparation for an attorney/client relationship with Schrager.

In fact, several weeks after Felton sent the last of the files to Boring, Felton called Schrager, not to retain him as counsel, but to find out why Boring had not been performing the aforesaid tasks for which he had been hired. (Tr. I, p. 217). These files which were captioned "Mission Impossible", were directed to Boring, not Schrager. (Tr. I, pp. 187–91, p. 214). Thus, on this record, no attorney/client relationship was sought to be established by Felton with Schrager, and no attorney/client privilege existed in the files Felton turned over to Boring.

 The court further finds that the government did not engage in bribery or any misconduct in the acquisition of those files, although Boring was given a promise of help with his drug problem. (Tr. I, pp. 266–9). Moreover, the government in obtaining the files had no reason to believe that they were part of any attorney/client dealings. (Tr. II, pp. 131, 136–7), since Boring told the government agents that he

was doing work for Felton and offered the files as related to that work. (Tr. II, p. 137).

### Photographic Spread

 The defendant Felton has moved for an order compelling the government to reveal the circumstances surrounding the display of photographs of defendant Felton by government agents to potential witnesses. The defendant contends that the use of those photographs was prejudicial and that any in-court identification by a witness who has been exposed to the photographic spread should be held inadmissible. Testimony at the hearing, however, revealed that the photographs only were shown in order to determine if any of the subjects depicted thereon were known by the witnesses, and not to elicit the identification of any defendant. We are satisfied from a consideration of all the circumstances surrounding the use of the photographs that no prejudice to the defendant has occurred. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *United States v. Levi*, 405 F.2d 380 (4th Cir.1968). The motion to suppress, therefore, will be denied at this time with leave to the defendant to renew it at the trial if the record at that time indicates that he has been prejudiced unfairly by the pretrial use of the photographic spread.

### II

### *Defendant Hathorne*

Hathorne has filed a number of motions. We will consider his motion to dismiss on grounds of double jeopardy and certain of his miscellaneous motions here, while his more general discovery and severance motions will be discussed in Part VI.

### Double Jeopardy

In 1982, Hathorne pled guilty in the Northern District of Florida at No. MCR 82–202 to conspiracy to possess with intent to distribute a Schedule I controlled substance; to-wit, marijuana, in violation of 21 U.S.C. § 841. That case involved the pos-

session in Florida of two planeloads of marijuana. Hathorne also pled guilty in the Northern District of Georgia in 1982 to conspiracy to import a Schedule I controlled substance; to-wit, methaqualone, in violation of 21 U.S.C. § 841. One of the defendants indicted with Hathorne in Georgia also was indicted in the Florida case.

In the present action, Hathorne is charged under 21 U.S.C. § 841(a)(1) with conspiracy to distribute and possession with intent to distribute a Schedule I controlled substance; namely, marijuana. Overt Act Nine names defendant John Hathorne as the seller of approximately 650 pounds of marijuana to defendant Dean Felton.

Hathorne contends that his Fifth Amendment right against double jeopardy has been violated in that the conspiracy charged in the present case is in fact part of the two conspiracies set forth above to which he already has pled guilty.

■ Upon our finding that the motion was nonfrivolous (Tr. II, p. 58), the burden fell upon the government to show by a preponderance of the evidence that the offense in the case at bar was separate and distinct from either of those charged in the prior cases. *United States v. Inmon*, 568 F.2d 326 (3d Cir.), *cert. denied*, 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1977). In other words, it became the government's burden to prove that the offenses charged were not "in law and in fact the same offense," *United States v. Young*, 503 F.2d 1072, 1075 (3d Cir.1974), likewise it became its burden to prove that the evidence required to support a conviction under either of the prior indictments would not have been sufficient to warrant a conviction under the instant indictment. *Id.; United States v. Ewell*, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). It must also appear that a relevant conspiracy has not been subdivided arbitrarily for purposes of prosecution. *Inmon*, 568 F.2d at 330.

■ The defendant urges this Court to use the "Five Point" test of *United States v. Marable*, 578 F.2d 151 (5th Cir.1978), which defendant contends was adopted by this Circuit in *Young, supra*. However, rather than simply adopting the "Five Point" test *per se* in *Young*, the Circuit required the district courts to consider *all* factors which may be relevant to a determination of whether two conspiracies are the same, and to do so with a single focus in mind; namely, to determine whether or not the acts alleged in the second indictment were carried out in furtherance of the same agreement as that involved in the first indictment. The factors which we must consider include: time, personnel, location, the offenses charged, the overt acts charged, the evidence introduced in each case, and the facts actually proved.

■ We believe that there can be no colorable claim to double jeopardy based on the Georgia indictment, since it involved methaqualone, a different drug than the one involved here, marijuana. Moreover, the alleged conspiracy to smuggle drugs in the Georgia case involved law enforcement officials, a county commissioner, and the defendant, an entirely different conspiratorial concept than anything charged at Criminal No. 83–49. (Tr. II, pp. 75–76). We are satisfied, therefore, that the Georgia conspiracy was of such a different composition and nature and so clearly separate and distinct from the one charged in the present indictment that the Georgia case merits no further discussion. We proceed to consider the Florida indictment.

■ The first of the factors which we consider is "time." The time period of the Florida indictment, December 1, 1980, to March 2, 1981, is encompassed by the time frame of the current indictment, which began in 1979 and ran until May 13, 1981. The defendant contends that while the indictment in Florida may not have included September, 1980, the events of that month, which include Overt Act Nine of the present indictment, were nevertheless part of the government's case in Florida. This, he argued, would be shown by the testimony he gave at the trial of John Rose, a co-defendant in the Florida case. Having

reviewed the trial transcript in the case of *United States v. John H. Rose, et al.,* at No. MCR 82–202, however, we find no indication that present Overt Act Nine was any part of the case against Hathorne in Florida. (Tr. II, pp. 93–97).

The second factor we consider is "location." The defendant contends that part of the conspiratorial acts as charged in the Florida indictment as well as those acts as charged in the instant indictment occurred in the Atlanta, Georgia, area, and that the Atlanta area, therefore, is in effect charged as the home of the conspiracy. It is obvious, however, that the Atlanta area is large enough to support two simultaneous drug conspiracies, *United States v. Papa,* 533 F.2d 815 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). Further, we find as a fact from the testimony of Agent Renton that none of the events involved in the Florida indictment occurred in the Western District of Pennsylvania. (Tr. II, p. 74).

Next, we look to the "personnel" of the two conspiracies. The defendant contends that all seven co-conspirators in the Florida indictment have been shown to have played "some part in the smuggling venture in September of 1980, of which Overt Act Nine was a portion." (Final Brief of Hathorne, p. 3). But there was no evidence at the hearing that Paul Lynn Rice or John Rose, co-conspirators in the Florida case, were involved in the Criminal No. 83–49 conspiracy. Further, although the defendant identifies Thomas D. Black, one of the co-conspirators charged in the Florida case, as a probable participant in the present case, DEA Agent Carroll testified with regard to the acts set forth in Overt Act Nine of the present indictment that "[t]o my knowledge, I don't believe he [Black] was there. He may have been as far as the off-load crew, but ... I am not sure." (Tr. II, p. 99). While the other defendants in the Florida indictment—Hathorne, Sabo, Eddie Black, Baxley, and Masters—have been linked with at least one of the Overt Acts numbered 7–8 and 10–17 of the present indictment, this participation does not appear to be dispositive, since at the

hearing, the government presented evidence of a second and separate conspiracy. Agent Carroll testified that the defendants Thurman and Hathorne were involved in a partnership (Tr. II, p. 95) that covered Overt Act Nine and the events of September, 1980. The agent described the responsibilities of each member of the partnership and testified as to the reason for, and time of, the dissolution of that partnership in Florida. (Tr. II, p. 96). Furthermore, Hathorne is the only one of the present defendants who also was indicted in the Florida case; and none of the present defendants was involved in the shipments of marijuana that were the subject matter of the Florida case. (Tr. II, pp. 73–74).

We find, therefore, that the government has shown by a preponderance of the evidence that the conspiracy charged at Criminal No. 83–49 is a separate and distinct conspiracy from that charged in the Florida indictment at No. MCR 82–202. We find, further, that Overt Act Nine of the present conspiracy was not committed in furtherance of the conspiracy alleged in the Florida indictment and, accordingly, deny the defendant's motion to dismiss on grounds of double jeopardy.

### Miscellaneous Motions

█ Hathorne's motion for early discovery and citation of authorities and the renewal of his motion for early discovery will be denied as moot. His motion to compel disclosure of plea bargains, preferential treatment and promises to witnesses in effect requests Jencks Act material, which will be supplied at the time of trial. The motion will be denied.

█ Hathorne's motion to dismiss for prosecutorial vindictiveness also will be denied. Here he alleges that after pleading guilty in Georgia to a conspiracy to import methaqualone, he met with Assistant U.S. Attorney Craig Gillan. During that June or July, 1982, meeting he allegedly was informed that if he attempted to have his convictions set aside he would be prosecuted for "all possible charges."

Hathorne asserts that the present indictment was brought as a result of his filing a motion under Rule 35, Fed.R.Crim.P., in Georgia for the correction of his sentence. The defendant has the burden to prove this accusation, but he offered nothing in support thereof but the unsubstantiated allegations of a threat in Georgia followed by the subsequent indictment in this District. That is insufficient proof to sustain his burden. For, while the mere *appearance* of vindictiveness may be sufficient to give rise to a presumption of a vindictive motive, *United States v. Griffin,* 617 F.2d 1342 (9th Cir.), *cert. denied,* 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980), the mere *allegation* of vindictiveness obviously is not.

■ The defendant Hathorne's motion to dismiss indictment for pre-indictment delay likewise will be denied. The court finds that Hathorne was not "accused" for Sixth Amendment purposes when he was brought to the Allegheny County Jail from FCI Tallahassee, Florida, for questioning before the Grand Jury. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1977). Under *Marion,* he did not become an accused until he was indicted, thus, there has been no delay which violated his Sixth Amendment right to a speedy trial.

■ Defendant's motion to dismiss for lack of jurisdiction or lack of venue also will be denied. Venue is proper in a conspiracy case "in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the co-conspirators." *United States v. Smith,* 692 F.2d 693 (10th Cir.1982). Sufficient allegations of activity within this jurisdiction have been made to establish that venue and jurisdiction here are proper.

---

**6.** 18 Pa.C.S.A. § 5703 provides in part:

Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:

. . . . .

(2) willfully discloses or endeavors to disclose to any other person the contents of any

---

## III

### *Defendant Serrao*

Serrao's motions, other than his motion to suppress, will be discussed in Part VI.

Defendant Serrao filed a motion to suppress a tape recording of an alleged phone conversation between defendant Felton and himself. Certain aspects concerning the validity of the seizure of this tape, which was seized by authorities following a private search of a garage in Utah, have already been considered herein. *See* pp. 187–88, *supra.* Serrao makes two general arguments: first, that 18 Pa.C.S.A. § 5703(2), (3) (Purdon 1983) and 18 U.S.C. § 2511(1)(c) (1982) prohibit the disclosure of the tape, and, second, that the tape was a product of an illegal search.

Under Pennsylvania law, 18 Pa.C.S.A. § 5703, it is a felony of the third degree to disclose the contents of a wire communication obtained in violation of the statute.[6] Serrao argues that he gave no consent to have his conversation recorded and that since state law requires prior consent by *"all* parties to the communication," (18 Pa. C.S.A. § 5704(4)) where the interceptee is an individual, and he did not give prior consent to the taping of his phone conversation, it is illegal to disclose the contents of the tape. The government, he argues, should not be allowed to reap the benefits of such unlawful conduct by using the contents of the tape seized in Utah.

Serrao further argues that federal law makes it a criminal offense to disclose communications intercepted in violation of the Pennsylvania statute, since the federal statute allows individuals to intercept communications with the consent of only one party "unless such communication is intercepted for the purpose of committing any

wire or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication.

criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act." 18 U.S.C. § 2511(2)(d). Thus, he argues, because the taping itself was in violation of state law it also would be in violation of federal law and the contents cannot be disclosed even though the purpose of the interception was not to further the commission of an independent crime or tort.

 We disagree with the defendant's interpretation of Pennsylvania law. In *Commonwealth v. Goldberg,* 208 Pa.Super. 513, 224 A.2d 91 (1966), the Superior Court held that the language in the statute requiring consent of *all* parties to the communication did not apply where the interception was by a subscriber on his own line. The *Goldberg* court spoke in terms of a "paramount right" to make interceptions on one's own line. *Id.* at 514; 244 A.2d at 92. However, we need not decide whether the taping of the conversation in fact violated Pennsylvania law. Even if Pennsylvania law was violated, that fact would not render the recordings inadmissible in a federal criminal trial. As long as federal law is satisfied and federal standards of reasonableness are met, the evidence is admissible despite the fact that the interception, *per se,* was a violation of state law. *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). Because we find that the tape was made with consent of one of the parties, *United States v. Kelly,* 708 F.2d 121 (3d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983), we find it admissible, or, in any event, not subject to suppression. *United States v. Armocida,* 515 F.2d 49 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *United States v. Horton,* 601 F.2d 319 (7th Cir.) *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979).

The defendant's second argument is that the tape should be suppressed because the physical tape was illegally *seized* in violation of his Fourth Amendment rights. The government responds that the defendant Serrao has no standing to challenge the seizure of the tape because he was not present when the seizure occurred and had no proprietary interest or constitutionally protected legitimate expectation of privacy in the area or thing searched.

If the "area searched" is defined as the storage areas in Utah from which the tape was seized, then the defendant clearly does not have standing. Indeed, the defendant admits "that he did not have any legitimate expectation of privacy in the area searched." (Defendant's supplemental brief, p. 2). He claims, however, a statutory expectation of privacy under both federal and state law (18 U.S.C. § 2510 *et seq.* and 18 Pa.C.S.A. § 5701 *et seq.* ). Specifically, the defendant contends that he has a legitimate expectation of privacy in the "oral communication which is the relevant portion of the item seized and since the circumstances surrounding the seizure cannot withstand constitutional scrutiny, the tape-recorded conversation should be suppressed." (Defendant's supplemental brief p. 2).

We previously held, *supra* pp. 187–88, that the seizure of various items, which included the tapes here in question, from the "Rent-A-Space" premises in Salt Lake City, Utah, was consensual and not in violation of anyone's Fourth Amendment rights. So even if Serrao has standing to challenge that seizure on Fourth Amendment grounds, his motion to suppress must fail. And since it is uncontested that the telephone conversation in question was taped by one of the parties thereto, to-wit, defendant Felton, there is no violation of the federal statute, 18 U.S.C. § 2511(2)(d). Thus, as we previously held *supra* at p. 193, neither of the "wire tap" statutes cited by the defendant would render the evidence inadmissible in federal court. This aspect of defendant Serrao's motion, therefore, also must be denied.

One final argument, however, must be addressed. For even if the seizure of the *physical* tape cassette was proper, and even if there is no basis to challenge the evidence as an intercepted oral communication, the question remains whether the de-

fendant's Fourth Amendment rights were violated by the "seizure" of the *"oral communication"* found on the physical cassette?

■ The threshold and, indeed as we shall see, the dispositive question is whether defendant Serrao has standing or a constitutionally protected reasonable expectation of privacy in the *contents* of the tape. If he does, then, of course, the government again has the burden to show that the "seizure" of the contents; to-wit, the oral conversation satisfied constitutional standards.

We find that the defendant Serrao had an expectation that the underlying *phone conversation* would be private, and, while he assumed the risk that the party in whom he was confiding was an informant or would turn information over to the government, Serrao did not assume the risk that the government would listen to the conversation under circumstances that were in violation of his Fourth Amendment rights. Consequently, we believe that the defendant does have standing or a constitutionally protected reasonable expectation of privacy in the oral communication.

■ In *United States v. Jacobsen*, —— U.S. ——, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Supreme Court stated that "the legality of the governmental search must be tested by the scope of the antecedent private search ... The Fourth Amendment is implicated only if the authorities use information with respect to which the expectation of privacy has not already been frustrated." *Id.* 104 S.Ct. at 1658. Although the government obtained the tape legally as the by-product of a private search, Serrao's expectation of privacy in the *contents of the tape* had not been frustrated by the private search, since the contents thereof obviously were not in plain view. Listening to the tape, therefore, constituted a search within the meaning of the Fourth Amendment. *Id.* at 1660. Moreover, there was no proof offered by the government that the cassette had any label or marking that would suggest the nature of its contents or which would give the government even colorable authority to listen to the tape without a proper warrant. In this regard, the government had even less cause to listen to the tape than the government had in viewing the films which was found to be an unreasonable search in the analagous case of *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). Inasmuch as the government had possession of the cassette, there was no exigent circumstance that would justify a search without first obtaining a warrant. Finally, listening to the tape constituted a search, *Jacobsen*, 104 S.Ct. at 1661, which was designed to reveal "private" facts and is, therefore, distinguishable from the limited search in *Jacobsen. See, id.* at 1661–62. Accordingly, we find that the listening of the tape constituted an illegal search under the Fourth Amendment and that the content of the tape in which Serrao was a party must be suppressed.

We recognize that an argument could be made by the government (although, in fact, it has not been) that Serrao had neither standing nor a constitutionally protected reasonable expectation of privacy in the *contents of the tape*, as distinguished from the *actual telephone conversation* out of which it grew, because, *inter alia*, the tape exist separate and apart from the telephone conversation, the tape was created by a private citizen through no violation of defendant Serrao's constitutional or federal statutory rights, and in fact Serrao did not know of its existence prior to the commencement of this case. Therefore, since he could have no proprietary or possessory interest in the *physical tape* or the physical area searched, and logically could have no expectation of privacy in the contents of an object that he did not know existed, he has no Fourth Amendment right to protect or standing to raise.

■ Even if that thesis proved valid, however, it would be of academic interest at best, since it is clear that defendant Felton, who has joined by agreement of counsel in all relevant motions filed by other defendants, clearly has both standing

and a constitutionally protected reasonable expectation of privacy in the *contents of the tape* which he created and owned. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *Walter*, 447 U.S. at 654, 100 S.Ct. at 2400. Because it must, for reasons stated above, be suppressed as to Felton, there is no way that it can be admitted in evidence at a joint trial against Serrao alone, because it is clear that to have relevance and meaning to the jury it must be revealed that it is a conversation between co-conspirators; i.e., Felton and Serrao, or under Count Eight a conversation between Felton and Serrao relative to the "whereabouts of John Zorak a/k/a Johnny, a co-conspirator in Count One above, and the location of a quantity of marihuana." Count Eight, Indictment at Criminal No. 83–49. This obviously would violate Felton's rights. Therefore, the contents of the tape will be suppressed as evidence in this case.[7]

## IV

### Defendant Bruce

Nancy Bruce has made a motion to sever on the grounds that her defense would be antagonistic to that of Felton. She asserts that the antagonism arises out of her former personal relationship with Felton. Specifically, Bruce claims that she was not part of the Felton conspiracy, that she merely followed Felton's instructions, and that now she has learned that her name was forged in the purchase of personalty and that real property was placed in her name without her consent. She contends that she has records that would be exculpatory of her but inculpatory of Felton.

■■■■■ A motion to sever is within the sound discretion of the court. *United States v. De Larosa*, 450 F.2d 1057 (3d Cir.1971). Antagonism, *per se*, between the defenses of the defendants does not require severance. *United States v. Davis*, 623 F.2d 188 (1st Cir.1980); *United*

*States v. Barber*, 442 F.2d 517 (3d Cir. 1971). The desire of the defendants to blame each other is an insufficient reason as well. *United States v. Talavera*, 668 F.2d 625 (1st Cir.), *cert. denied*, 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982). Severance will be granted only if a joint trial would be so prejudicial, that the defendant would be unable to obtain a fair trial. *United States v. DeSimone*, 660 F.2d 532 (5th Cir.), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1981). An antagonistic defense is sufficiently prejudicial only where the defenses are irreconcilable and mutually exclusive. *United States v. Provenzano*, 688 F.2d at 198–9.

■■■■■ The defendant Bruce has not demonstrated any prejudice sufficient to warrant a severance. There is no indication that the defenses which she alleges will be presented are irreconcilable with, or mutually exclusive to, any defense that the defendant Felton intends to raise. Finally, there is no indication that the evidence is so complicated that a jury could not keep the evidence pertaining to any one defendant compartmentalized. *United States v. Boscia*, 573 F.2d 827 (3d Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978). The defendant's motion will be denied.

## V

### Defendant Thurman

■■■■■ Defendant Thurman has made a motion for an order requiring the government to affirm or deny certain unlawful acts, for disclosure of information relating to those acts and for a "taint" hearing. The defendant seeks to know whether any evidence was seized in the course of or as a result of an illegal wiretap.

This court finds that since the defendant has not asserted that any unlawful wiretapping has been used against him, he is not entitled to the order that he requests. Be-

---

7. This ruling will apply as well to the tape recording between defendants Felton and Cox, which appears to be in all substantive respects identical to the Serrao tape; i.e., it was seized and the contents learned during the same search and under identical circumstances as the Serrao tape, and the defendant Cox also has joined in relevant motions.

cause the defendant seeks only to know if such wiretapping has occurred, and has not asserted that there has been such, the defendant has not articulated prerequisite "colorable" basis for his claim. *Cruz v. Alexander*, 669 F.2d 872 (2d Cir.1982); *In re Evans*, 452 F.2d 1239 (D.C.Cir.1971). While "mere assertion" of surveillance is sufficient without supporting evidence to require the government to respond under 18 U.S.C. § 3504, the assertion must state in a declarative fashion that surveillance has occurred. "An allegation that it 'may' have occurred will not suffice." *United States v. Rubin*, 559 F.2d 975 (5th Cir. 1977), *vacated on other grounds*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978). The defendant's motion, therefore, will be denied.

Next, Thurman moves that the court order the government to disclose all information concerning the use of informants in this case, including their identity, addresses and statements.

■■■ The defendant correctly states that in *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) the Supreme Court established a test for determining whether the government was within its privilege to refuse disclosure of the identity of informants and the information supplied. This test requires a balancing of the public's interest in protecting the flow of information and the individual's right to prepare his defense. *Id.* at 60, 77 S.Ct. at 627.

■■■ The defendant contends that the information is crucial to his defense. He argues that the indictment covers a long period of time from the beginning of 1979 to May of 1981, that the use of special agents and informants may have been widespread. He speculates further that a government source may have been a major participant in the offense charged. Thus, in light of the totality of circumstances, Thurman believes that the information should be released. If this court does not grant the motion, and there is any question as to the results of the *Roviaro* test, then Thurman requests an *in camera* hearing

before the Court. *See, United States v. Cortese*, 614 F.2d 914 (3d Cir.1980).

Considering the time frame of the indictment, the nature of the crime charged, and the specifics of the allegations made against the defendant, we find that the defendant has not established a need for disclosure sufficient to outweigh the public's interest in protecting the flow of information, and, that in any event, there is no indication that the government's case against him relies in any way on confidential informants. *United States v. Scott*, 555 F.2d 522 (5th Cir.), *cert. denied*, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977). Accordingly, the defendant's motion for pretrial disclosure of information concerning informants will be denied. Further, the court finds no basis in the record for an *in camera* hearing at this time.

## VI

### *Remaining Motions*

*Severance: Thurman, Hathorne, Serrao*

■■■ Defendants Thurman, Hathorne and Serrao also have filed motions seeking severance of their cases from the trial-at-large. We have set forth earlier under Section IV the general principles applicable to severances. These apply as well to the instant motions and will not be repeated here.

Defendant Thurman's motion for severance is based on his claim that the jury will not be able to segregate the evidence, that mutually antagonistic defenses will be asserted, that pretrial publicity might spill over on him, and that he will not be able to elicit exculpatory evidence from his co-defendants.

Defendant Hathorne argues that his trial should be severed because he participated in only one overt act and is not, therefore, shown *prima facie* to be a member of the conspiracy, that the jury cannot be expected to segregate the mass of evidence as it relates to the several defendants, that the defendant's double jeopardy motion would delay trial and, therefore, prejudice the oth-

er defendants, that a large trial would detract from his insanity defense, and that he must rely on the testimony of other defendants to exculpate him.

Defendant Serrao seeks severance because he was mentioned in only one overt act, and believes that a joint trial would be prejudicial.

We find that none of the defendants has established (1) that there would be sufficient prejudice to justify a severance as to him, *DeSimone, supra;* (2) that an insanity defense or any other defense antagonistic to that of co-defendants could not be segregated by the jury, *Boscia, supra;* (3) that pretrial publicity as to one defendant will spill over on others sufficient to deny their right to a fair trial, *United States v. Frumento,* 405 F.Supp. 23 (E.D.Pa.), *aff'd,* 559 F.2d 1209 (3d Cir.1977), or, indeed that there will be any pretrial publicity; (4) that an appeal will prejudice other defendants; (5) that the need for the testimony of co-defendants meets the test of *Boscia, supra;* or (6) that the allegedly "minimal" participation of the movants, *United States v. Boyd,* 595 F.2d 120 (3d Cir.1978), warrants the granting of their motions to sever. Therefore, the defendants' motions for severance will be denied.

### Discovery: Thurman, Hathorne

█ Defendant Thurman has submitted a twelve-page motion for discovery. The motion is prefaced by a statement of counsel for defendant Thurman that he previously had spoken with the Assistant U.S. Attorney in charge of the case who stated that the government "would informally provide the Defendant with general discovery material." As a result, counsel states that the defendant was "only filing a general motion" under Rule 16, Fed.R. Crim.P. and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In view of the foregoing and the fact that the motion does indeed appear to be a broad, general, boiler-plate, which, in effect, simply requests all the material to which the defendant possibly may be entitled under any existing rule or case law

authority, and, in some instances, seeks material to which he plainly is not at all entitled to at this time, *e.g.,* Jencks material, the motion will be denied in the present form in its entirety, and counsel, who presumably has now been provided the general discovery which the government promised, will be given leave to present a more specific request within twenty days.

Thurman's motion for notice by the government of the intention to use evidence arguably subject to suppression will be denied. Thurman's request for notice of government's intention to use evidence discoverable under Rule 16 will be granted to the extent that it asks the government to give notice under Rule 12(d)(2).

Hathorne's motion to require the government to disclose its intention to use evidence which may be the subject of a motion to suppress will be granted only insofar as it seeks oral or written statements by himself and shall include any other material discoverable under Rule 16 via Rule 12(d)(2). Hathorne's motion for production of favorable evidence which seeks both *Brady* and Jencks Act material will be granted with respect to *Brady* material, and denied to the extent that the defendants seek Jencks material.

### Bills of Particulars: Thurman, Hathorne

█ Defendants Thurman and Hathorne have filed motions for bills of particulars. Defendant Thurman's request in paragraph 1 seeking names of all co-conspirators is granted to the extent that Felton's similar request was granted at the suppression hearings. The requests of paragraphs 2, 3, 4, 5 and 7 will be denied for the reasons and to the extent that Felton's similar requests were denied. Beyond that they appear to be moot, since considerable information was disclosed at the hearings. The request of Paragraph 6 seeking when, where and in what matter he is alleged to have become a member of the conspiracy will be denied. *United States v. Bozza,* 234 F.Supp. 15 (E.D.N.Y.1964).

Hathorne's general request for a full bill of particulars will be granted to the extent that Felton's requests were granted at the hearings and denied in all other respects.

An appropriate order will follow.